Leon B. Polsky, J.
The defendant has been charged in an indictment voted by the Grand Jury of the Extraordinary Term with 24 counts of criminal contempt in the first degree arising out of his refusal to answer 24 questions asked of him before the Grand Jury and which he had been directed to *158 answer by the foreman and the Justice by whom the Grand Jury had been empaneled.
The defendant is an attorney who in 1973 and 1974 represented various individuals who were called before a Grand Jury investigating the now well-known disappearance of huge quantities of "French Connection” narcotics from the office of the Police Property Clerk. In October, 1974 he was summoned before the Grand Jury to be questioned concerning his relationship with and conversations with his clients.
At his first appearance before the Grand Jury, the defendant was advised of the scope of the inquiry and that he would receive transactional immunity. He asked whether he had been the subject of electronic surveillance and for an adjournment to obtain counsel. On October 30, 1974 he appeared with counsel before the late Justice Murtagh and was advised that he had been the subject of electronic surveillance conducted under eavesdropping orders issued by the Justice. Defense counsel’s request for a hearing or to examine the orders was refused by. the court, and Judge Murtagh then directed the defendant to testify. The defendant reappeared before the Grand Jury on November 4 and 8 and answered numerous questions. As to some however he asserted certain objections among which were attorney-client privilege and illegal eavesdropping. On January 7, 1975 the Special Prosecutor sought and obtained an order from Judge Murtagh directing the defendant to reappear before the Grand Jury and answer certain specific questions — among them the 24 involved here. At that proceeding the defendant sought "a full fledged suppression hearing on the wiretap” and his application was again refused.
The defendant then reappeared before the Grand Jury on January 14, 1975 and after preliminary statements and questions partially recounting the history of the matter, Mr. Lopez was asked if he was prepared to testify and given the opportunity to make a statement.
In the statement he related his awareness of the directive by Justice Murtagh that he answer the specified questions and that the immunity he had received relieved him of all personal liability except that for perjury; however he persisted in his refusal to answer the specified questions stating:
"Nevertheless, the end result leads irrevocably to my rendering testimony before the Grand Jury and at possible criminal proceedings and trials of those very persons who came to *159 me in trust and upon the reliance that on my oath as an attorney I would maintain inviolate their confidences and present to the best of my ability their innocence. The obvious and easy thing for me to do is testify. It is the road and line of least resistance. It preserves me and my family. I escape at least public stigma since I did only what Mr. Justice Murtagh directed me to do * * * It is the way out of a dilemma.
"Nevertheless, I cannot escape my conscience, shirk my responsibilities nor avoid the command of the [Canons of Ethics] with regard to maintaining inviolate my client’s secrets. Today, to preserve the integrity of the adversary system, to maintain intact the attorney-client relationship * * * to afford and preserve the right to challenge through litigation the electronic surveillance of which we have been subject, which I believe to be unlawful and illegal and upon which your inquiry is based, I must with great pain and regret maintain my previous posture before you and assert those objections and preserve those rights as to your questions which I have previously set forth.” In response to the first of the substantive questions asked of him, and which he was then directed to answer by the foreman, Mr. Lopez responded: "With regret, Mr. Foreman, and based on the attorney/client relationship, the Work Product Rule, the Sixth Amendment, the feeling that your question is based on an illegal and unlawful electronic surveillance, I must decline to answer that question for all of the reasons previously stated likewise [sic?]. ”[1]
By agreement with the prosecutor the defendant’s response and initial statement were treated as applicable without repetition to the succeeding questions which the defendant refused to answer.
Although the People do not claim otherwise, it is clear that the defendant has preserved whatever right he may have to assert the illegality of the eavesdropping. The fact that the attorney-client privilege was also raised does not affect the clearly stated and understood objection based upon illegal electronic surveillance.[2]
*160 WAIVER
The People contend that by answering some questions, particularly on November 4, the defendant forfeited his right to refuse to answer others. The underlying theory of the People’s contention is that by answering some questions under a grant of transactional immunity and then refusing to answer others, the witness has somehow misled the prosecutor into conferring immunity without gaining the full benefit of the witness’ testimony. Both legally and factually I reject the People’s contention.
From the very nature of the questions which the defendant witness answered it is readily apparent that either no attorney-client privilege attached or the questions related to historical facts which were likely to be available and known to the interrogator independent of eavesdropping.
Analysis of the questions to which the witness responded clearly demonstrates the absence of any colorable claim of privilege or possibility that the questions were derived from electronic interceptions. On November 4, the witness was asked 49 questions concerning persons he had represented in cases being handled by the office of the Special Prosecutor and whether his fees had been paid. Eight other questions were asked and answered relative to the appearance of other attorneys as cocounsel in some of these cases. Another 23 questions were asked and answered relating to where and when he had met these clients and several other questions were asked concerning Lopez’ conversations with Assistant Attorney-General Phillips. Not only was the witness required to give this information in order to prove the validity of the privilege he was asserting (5 Weinstein-Korn-Miller, NY Civ Prac, par 4503.19) but also the witness had represented all but one of the persons named in dealings with the interrogator’s office. Thus it would be clear to the witness that these questions could have been asked based on historical facts known to the prosecutor independent of eavesdropping and there could be no sound basis for asserting illegal electronic surveillance as their source.[3] However, when the witness was questioned as to *161 the purpose of these meetings or the content of the conversations he uniformly refused to answer.
Even if there was a factual basis to the People’s contention that the witness selectively chose those questions he was willing to answer in order to gain statutory immunity from prosecution, there is no legal substance to the conclusion of waiver which the People claim would follow from such selectivity.
In order to prevail on this motion the defendant must establish that the electronic surveillance was unlawful (discussed infra) and that the questions derived from such surveillance or the answer would require disclosure of the intercept. If the question has its genesis in a source other than electronic surveillance, then the legality or illegality of the interceptions is irrelevant and the witness has no right or privilege to refuse to answer (Lanza v New York, 370 US 139; People v Langella, 51 AD2d 906, mot for lv to app den 39 NY2d 839). Thus if the defendant, while a witness, had refused to answer any of the 100 or so questions he did answer, he would have been guilty of contempt.[4] The law does require the witness to selectively assert his claim and by doing so he cannot be forced onto the horns of the dilemma the People seek to create.
The People would have it that the immunity granted as a quid pro quo for compulsory relinquishment of the Fifth Amendment privilege against self incrimination also does service as the basis for the compulsory abandonment of the lawyer-client privilege and the right to object to illegal electronic surveillance. For the reasons stated, I find that it does not.
THE EAVESDROPPING
The People concede that the 24 questions asked of the *162 defendant before the Grand Jury were derived from electronic surveillance conducted at the defendant’s law office pursuant to a series of eavesdropping orders issued by the late Justice Murtagh beginning on June 8, 1973 and terminating in July of 1974.
Initially, that eavesdropping consisted of "bugs” and wiretaps directed at the defendant’s then law partner, Rosenberg, in connection with a case-fixing scheme. Although the Rosenberg warrants did not authorize interceptions of Lopez and specifically precluded interceptions of conversations falling within the lawyer-client privilege, nevertheless — in what the People characterize as a "serendipitous” interception — the People overheard a conversation on September 11, 1973 between Mr. Lopez and one of his clients, Frank King. Based upon this conversation, the People obtained, on September 13 and September 15, 1973, warrants authorizing eavesdropping on Lopez’ office and telephones relating to the "French Connection” investigation.
The People concede the defendant’s standing to challenge the Rosenberg warrant and acknowledge that the legal basis for the eavesdropping on Lopez cannot be established independently of the interceptions authorized in the Rosenberg warrants. I have previously held the Rosenberg eavesdropping to have been illegal after July 6, 1973 (People v Rosenberg, NYLJ, Oct. 20, 1976, p 13, col 1). While it is unnecessary to repeat the details of my earlier decision, it should be noted that the determination of illegality was not based upon technical grounds but rested upon substantial defects in the eavesdropping applications which in my view would have precluded extending the eavesdropping orders past July 6, 1973. It should also be noted that subsequent hearings in the Rosenberg case have developed evidence which suggests additional grounds for suppression.[5]
*163 The People have declined the court’s offer to permit a de novo relitigation of the validity of the eavesdropping. Although "not conceding] the correctness” of my earlier decisions of October 20 and December 14, 1976, the People state that it "will not rely upon the validity of the eavesdropping to sustain the instant indictment.”
Based upon the uncontradicted allegations in the pleadings and the stated concessions, I find that the questions asked of the defendant before the Grand Jury and which he refused to answer, flow directly and without attenuation from eavesdropping interceptions which were made after September 13, 1973 pursuant to court authorization. I find that the defendant has standing to challenge the warrants and the underlying warrants which provided the purported probable cause for the issuance of eavesdropping warrants directed against the defendant and, for the reasons previously stated, I find those warrants and the eavesdropping thereunder to be illegal.
The above findings are based upon procedural and substantive law of the State of New York. Additionally, but nevertheless independently, I make the same findings pursuant to the substantive law of the United States.
DISCUSSION
In this proceeding the defendant contends that as a defense to a criminal contempt indictment based upon the refusal to answer specific questions to which timely and proper objections were taken when he appeared before the Grand Jury as a witness, he may, in order to show the questions were not a "legal and proper interrogatory” (Penal Law, § 215.51), challenge the validity and lawfulness of court-authorized eavesdropping to which he had been subjected and from which were directly derived the questions which were propounded to him as a witness.
Before reviewing the controlling authorities, it is well to bear in mind that room exists for differences between Federal and State Law. To the extent that Federal statutes (e.g., US Code, tit 18, § 2515) compel consideration of the merits of the defendant’s claim, the supremacy clause (US Const, art VI, cl 2) requires such consideration by a State court (see People v *164 Schipani, 56 AD2d 126). However, even if Federal law does not so require, New York State may, for policy reasons of its own, afford greater opportunity to challenge a contempt indictment or civil contempt citation than afforded a Federal contemnor.[6]
A. FEDERAL LAW
There is no necessity for extended discussion or analysis of Federal law since it is clear from the decision, binding upon this court, rendered by the Appellate Division, First Department, in People v McGrath (57 AD2d 405), that the defendant may assert and prove the illegality of the eavesdropping as a defense to this criminal prosecution.
Even without McGrath, I would independently reach the same result under Federal law. The only Federal cases to which the court’s attention has been directed involve questions relating to the extent and procedure for challenge of the eavesdropping by a witness during the Grand Jury proceeding or by a contemnor civilly cited under subdivision (a) of section 1826 of title 28 of the United States Code (US Code, tit 28, § 1826, subd [a]).
These cases, in varying degree, deny full plenary suppression hearing at the Grand Jury stage of a challenge to the questioning (Gelbard v United States, 408 US 41) and disallow a "just cause” defense to a civil contempt beyond that which may have been established at the summary or partial hearing permitted by Gelbard. (See Matter of Persico, 491 F2d 1156, cert den 419 US 924.)
Both Gelbard and Pérsico turn upon the Federal perception of how Federal statute limits the timing and manner in which one may assert a claim which will interrupt a Grand Jury proceeding.
There has been nothing said in either line of cases which would deprive a person aggrieved by an unlawful interception of the right to challenge its derivative use in a criminal proceeding to which he is a party. (See United States v Calandra, 414 US 338, 352, n 8.)[7]
*165 B. STATE LAW
In People v Mulligan (40 AD2d 165) the defendant had been convicted of criminal contempt based upon his refusal to answer questions before the Grand Jury. After Mulligan’s indictment for criminal contempt, he moved for an evidentiary hearing on the legality of eavesdropping to which he had been subjected. The trial court refused to grant a hearing and the defendant was convicted after trial.
Upon its review, the Appellate Division noted that the defendant had not waived by failing to raise the eavesdropping objection before the Grand Jury or seeking the limited determination from the court provided for in Gelbard.[8] The court held (p 167) that the witness: "is entitled to await the formal accusation and service of the required notice [of eavesdropping] before moving for appropriate relief. It is only then that an inquiry could be appropriately made as to whether or not the questions asked by the Grand Jury were based on information acquired as the result of an improperly issued electronic surveillance order. And if they were, then this defendant cannot be convicted for his refusal 'to answer any legal and proper interogatory’. (Penal Law, § 215.51.)” Mulligan quite nicely sorts out the distinct issues presented. The motion challenging the electronic surveillance is only an incident and prelude to the tendering of a defense based upon the absence of one of the essential elements of the crime of criminal contempt (viz., that the questions were "legal and proper”).
This analysis was subsequently reiterated in People v Einhorn (45 AD2d 75) by the Appellate Division after the Second Circuit’s decision in Pérsico (supra). Although Einhorn related to the timing and manner of resolving preindictment objections to questions before the Grand Jury, both the majority and dissenting Justices agreed that a properly preserved claim could be fully litigated after a contempt indictment (p 80,
*166 Capozzoli, J.; p 81, Steuer, J., dissenting).[9]
Upon review by the Court of Appeals, the Appellate Division order was reversed upon the sole ground that the defendant, while a Grand Jury witness, had failed to adequately raise the "Gelbard” issue (see n 8, supra). However, the court specifically reaffirmed the availability of the defense of illegal electronic surveillance, stating, "A Grand Jury witness need not answer questions based on information obtained as the result of illegal wiretapping (U. S. Code, tit. 18, § 2515). Nor may the contempt power be used to compel such testimony or punish the witness for his silence. The claim of illegal wiretapping, if sustained, constitutes a defense.” (People v Einhorn, 35 NY2d 948, 949.)
More recently the First Department had occasion to consider the issue of the availability of the motion to suppress as part of the defense to a contempt indictment based upon an "evasive contempt”. (People v McGrath, supra.) Although I read the court’s decision holding the remedy and defense available in "evasive contempt” cases to be one grounded on Federal law, the case does reiterate the State law principles applicable to. a contempt charge based upon a refusal to answer questions before the Grand Jury.
It is clear, therefore, that a defendant is entitled to a plenary determination of a timely pretrial motion to suppress made in the course of a proceeding in which he is charged with criminal contempt based upon his refusal to answer questions previously asserted by him to be derived from unlawful electronic surveillance.
The question of the effect of the defendant’s prevailing on his motion challenging the eavesdropping merits some discussion. The cases referred to above speak in terms of a "defense” to the charge of contempt. Normally, the term "defense” relates to a matter which a defendant must raise at trial (Penal Law, arts 25, 30, 35, 40). Here, however, the claim of illegality is raised to counter one of the specific elements of the offense (that the questions were "legal and proper”) which *167 the People would be obliged to prove at trial. However, the determination of whether a question is legal and proper is one of law and reserved for the court (People v Ianniello, 36 NY2d 137). Since the resolution of this issue is peculiarly within the Judge’s responsibility and is inextricably related to a motion which must be made prior to trial, it would seem to necessarily follow that pretrial findings in the defendant’s favor must abort the prosecution.
Accordingly, the defendant’s motion to suppress evidence obtained by electronic surveillance and derived therefrom is granted and the indictment is dismissed because of the existence of a legal impediment to conviction of the defendant for the offense charged (CPL 210.20, subd 1, par [h]).

. In the context of prior discussions before Justice Murtagh, it is clear that the reference to "work product” and the Sixth Amendment relate to the assertion of the attorney-client privilege.

. I decide no question of Federal or State law relating to the correctness or propriety of the assertion of the attorney-client privilege and I also do not consider the correctness of the summary overruling of the claim of lawyer-client privilege and Justice Murtagh’s apparent reliance upon information received ex parte.
*160 Also I have not considered any question relating to the legal propriety of some half-dozen compound questions seeking both general factual information and requiring the witness to evaluate the legal significance of those facts.

. The People lay particular stress upon the defendant having answered a question in which he stated he had met one of his clients at a bank. Although the prosecutor hedges on the question of whether the witness gained over-all immunity by virtue of *161 this answer, the People contend that this is an example of Lopez picking and choosing the questions he was willing to answer. However, as noted in Weinstein-Korn-Miller (NY Civ Prac, vol 5, p 45-145) "the fact of consultation is easily observable by an outsider.” Thus not only does no privilege attach to the noncommunicative aspect of the meeting but the witness would have no reason to believe electronic surveillance was the source of the question.

. With the benefit of hindsight and the entire record, it appears to me that there were only two questions answered in the three Grand Jury appearances to which a refusal to answer would be apparently valid. As to both such questions the witness initially refused to answer but answered after the question was explained and pressed.

. Although the parties estimate that between 35,000 and 52,000 conversations were monitored and taperecorded during the 14 months of eavesdropping at the Rosenberg-Lopez law office, some unknown number of other conversations overheard on the "bugs” were not recorded because the former Special Assistant Attorney-General supervising the eavesdropping had given specific instructions to his investigators not to record all conversations. This instruction was based upon the assistant’s misconception of Justice Murtagh’s orders and the eavesdropping statute. It was the assistant’s view that an "interception” occurs only if the conversation is recorded while a monitored conversation, believed at the time to be nonpertinent, is not "intercepted” within the meaning of the statute and order if not recorded. Clearly this is not the law. Barring unusual circumstances, every overheard conversation must be recorded.
Additionally, and not necessary for resolution here, is the question of why and how *163 this "serendipitous” interception of a conversation not authorized in the existing warrants occurred on September 11, 1973.

. Unlike the Federal jurisdiction, New York, both traditionally and by statute, has insisted upon much tighter judicial supervision and review of Grand Jury proceedings. (See, e.g., CPL art 190, esp 190.3,0, subds 1, 3 4; 190.65, subd 1; CPL art 210, esp 210.20-210.45.) It is also noteworthy that the immunity granted before a State Grand Jury is "transactional” whereas the comparable Federal immunity is usually "testimonial” or "use” immunity.

. The decision in Langella v Commissioner of Corrections, State of N. Y. (545 F2d *165 818, 821, cert den 430 US 983) appears to agree that New York’s postindictment motion to suppress (CPL 710.20), comparable to the Federal motion to suppress (US Code, tit 18, § 2518, subd [10], par [a]), permits a defendant charged with criminal contempt to challenge the legality of the electronic surveillance. The case, however, dealt with the adequacy of the procedures at the earlier, Grand Jury, stage.

. Under subsequently decided cases it would appear that such failure would preclude later assertion of such claim (People v Tantleff, 40 NY2d 862; People v Gentile, 39 NY2d 779; People v Einhorn, 35 NY2d 948; People v Breindel, 35 NY2d 928; cf. People v De Salvo, 32 NY2d 12).

. At the time when the defendant appeared before Justice Murtagh, the Appellate Division decision in Einhorn was the most recent authoritative statement of the law and was extensively discussed by counsel and the court. In view of my resolution of this motion to dismiss, it is unnecessary to decide the interesting question of whether reliance upon the procedures outlined in that decision negatives the culpable mental state necessary for the commission of the crime of criminal contempt (see Penal Law, § 15.20, subd 2).