OPINION OF THE COURT
Shirley R. Levitt an, J.
The defendant was tried by the court without a jury for criminal contempt of a Grand Jury in the first degree (Penal Law, § 215.51), on 7 of 8 original counts of the indictment. Each of the seven counts charges refusal to answer a specific question posed to the defendant by an Assistant District Attorney, after having been advised that he received immunity from prosecution, by operation of law, and after having been ordered by a Supreme Court Justice to answer legal and proper questions. The eighth count had been dismissed prior to trial. The court here finds the defendant guilty of the charges stated in the first and fifth counts, and not guilty on the other five counts.
The purpose of the Grand Jury investigation was to determine whether crimes consisting of murder, criminal *934 sale and possession of a controlled substance, grand larceny by extortion, criminal usury, forgery and criminal possession of a forged instrument had been committed. The Grand Jury was seeking to ascertain whether the defendant in this action (Leo), another person, named Santaniello, and others had conspired to sell heroin, and were loansharking; whether Santaniello had conspired with others to murder his nephew; and whether there was a conspiracy to forge money and possess forged money.
Commencing on December 19, 1978, Santaniello, Leo and others were observed, followed and overheard by conventional police surveillance, at the entrance to the Antonio Society Social Club in Manhattan and elsewhere. On December 13, 1979, the District Attorney obtained an eavesdropping warrant from the Supreme Court issued by Justice Lang authorizing interception and recordation of oral communications occurring inside that club. The warrant was renewed on January 11,1980. On April 22,1980 a “notice of eavesdropping” and a Grand Jury subpoena were served on Leo. On May 5, he appeared before the Grand Jury, was sworn and acknowledged that he was accompanied by counsel attending outside the Grand Jury chamber. He read a prepared statement requesting that he be brought before a Justice for a ruling on the legality of the electronic surveillance. He, his counsel, and the Assistant District Attorney then appeared before Justice George Roberts who sustained the facial sufficiency of the eavesdropping warrants and directed Leo to answer all questions properly put to him.
On June 4,1980, Leo reappeared before the Grand Jury. The statutory definition of immunity from prosecution was read to him, and he was informed that notwithstanding its grant by operation of law he could be prosecuted for perjury and for contempt for refusal to answer legal and proper questions. Asked whether he understood the meaning of contempt, he refused to answer any questions and read a prepared statement.
The interrogation, however, commenced, and Leo initially answered questions concerning his employment. At one point, he inquired whether the questions were based upon electronic surveillance and reiterated his objec *935 tions. He was then informed: “I have indicated to you that some of the questions that we are going to ask you are going to be based on court ordered electronic surveillance. I told you that.” He was further told that he did not have the right to know the source of each particular question and would not be so informed. Leo then not only responded to a question, but, in response to no pending question, volunteered the information that he had obtained a lead to the brokerage house through a friend. He was then asked to identify that friend. He responded by asking if these questions were the product of electronic surveillance, and receiving no answer, he repeated his prior objection and refused to answer. He also refused to answer further questions.
By agreement, Leo, his counsel, and the Assistant District Attorney again appeared before Justice George Roberts, who again instructed Leo to answer all proper and legal questions, and who directed the Assistant District Attorney to repeat to Leo the questions he had refused to answer. On the following day, on June 5, 1980, Leo reappeared before the Grand Jury and was again interrogated concerning his understanding of his status as an immunized witness. Leo stated that he understood. The Assistant District Attorney then indicated that he was going to reask the questions posed on the preceding day and stated that “Judge Roberts directed you to answer the questions, correct?” Leo then read a prepared statement again refusing to answer the questions on constitutional grounds.
The prosecutor reread the testimony given at the previous day’s session and repeated those questions asked on the preceding day. In response to those questions and three additional ones, Leo once more read a statement, embodying his refusal to answer on constitutional grounds.
In effect, Leo chose to stand on his own conclusions of law and to rely upon them as defenses to any prosecution for disobedience of the court’s order. He thereby elected to accept the risk of his own error if his defenses were not sustained.
The District Attorney and the defendant’s counsel executed three written stipulations agreeing that on May 19, 1980, the Fifth Grand Jury for the May-June 1980 Crimi *936 nal Term of the Supreme Court in New York County was duly empaneled and sworn; that the defendant Leo testified before it on June 4 and 5, 1980; that its transcript is accurate; that the Assistant District Attorneys conducting the interrogation before the Grand Jury knew the source of each question at the time that they asked it; that the said Grand Jury was charged on the law of contempt and voted an indictment against Leo on June 10, 1980; that on the next day, June 11, the District Attorney’s office informed Leo’s counsel that he had been indicted; that Leo was arraigned on the following day, June 12; and that at the arraignment the District Attorney furnished the defendant with two volumes of “voluntary discovery”.
After indictment Leo made his omnibus pretrial motion, also addressed to Justice George Roberts. He also moved for suppression of evidence of his refusal to answer questions derived from information claimed to have been illegally obtained by virtue of the telephonic interception. As it turned out, the suppression motion was applicable to only the fifth count of the indictment which, as the prosecutor contends and the defense does not dispute, alone charged refusal to answer a question derived from wiretapping, namely whether Leo had a conversation with Santaniello concerning possession of counterfeit money.
By Justice George Roberts’ written decision, the eighth count was dismissed. In all other respects both the omnibus and suppression motions were denied. Regardless of applicability or inapplicability of the doctrine of law of the case to a criminal prosecution, the trial court concurs with Justice Roberts’ denial of the pretrial motions for dismissal and suppression, which were addressed to legal insufficiency of the indictment and other issues of law, and will not redetermine them. Needless to say, they do not determine factual issues presented by plenary trial, including the element of willful intent to contemn the Grand Jury beyond a reasonable doubt.
In Grand Jury interrogation, a prosecutor may be motivated to trap a witness into either (1) contempt, or (2) perjury or (3) the truth. Euchre into the first two traps corrupts and vitiates the subsequent prosecution (People v Tyler, 46 NY2d 251; see People v Pomerantz, 46 NY2d 240, *937 250), and in Pomerantz (supra, p 250), the Court of Appeals disarmed them: “Before concluding, it is essential to add a caveat. An investigatory examination which may seem to parallel what is approved in this case would not stand if on the record it were demonstrable that what was ultimately involved was a sophisticated facade to trap the defendant into a new crime of perjury or contempt, and not to establish evidence of antecedent crime. The court is concerned with substance, not form.” However, it differentiated them from the third so-called “trap” (which is more accurately denominated a rescue rather than a trap) holding that maneuvrance into truthful testimony does not itself offend principle (supra, at pp 243-244, 249-250): “Also at issue is whether the prosecutor’s questioning about the meeting, at which a scheme to defraud the Medicaid program was discussed, was aimed solely or substantially at trapping defendant into giving false testimony *** If indeed a trap was set, it aimed not at perjury, but at flushing out the truth. (Compare People v Tyler, 46 NY2d 251, supra, decided herewith.) *** It is true that in summation the prosecutor admitted wanting ‘to trap Joshua Pomerantz’ and ‘get knowledge about what he did.’ Critical in distinguishing this case from the Tyler (supra) case, however, is that it is not into giving false testimony that the questioner sought to trap defendant. Here the ‘trap’, as the prosecutor truly said, was aimed at ferreting out the facts. In short, the interest in furthering the investigation is manifest, and the technique employed unobjectionable.”
At bar, the court concludes from all of the evidence that the prosecutors’ objective was to compel Leo’s assistance, no matter how reluctant, in their quest for truthful evidence concerning Santaniello; and were willing to pay the price of transactional immunity to Leo (although it is not suggested that that grant alone gainsays a contempt trap). The court is persuaded that Leo was not the prosecutors’ chase; that their prey was a bigger catch, while Leo, although they could have elected to pursue him too, was perceived by them as a relatively small fish to fry and expendable as a lure. Their conscription of him into involuntary servitude to the hunt, constraining his betrayal of the trial to their intended kill, is constitutionally sane *938 tioned. Absent other conduct trespassing constitutional rights or encroaching self-imposed precepts of conscionable behavior, the prosecutors’ manipulation of the witness into performance of a duty which he was obligated to honor without their manipulation, but in their perception would not, is not interdicted. Their snare for Santaniello was openly exhibited to Leo. If— although it is not assumed to be the case — it posed to Leo the dilemma that he could not inactivate it other than by self-immolation to it, it did not assault any legal right of his, for the prosecutors had a valid license for it. To Leo they offered bait outside that trap — the opportunity to avoid pitfalls by truthful testimony.
The foregoing rule that an attempt by the prosecutor to maneuver the witness into truthful testimony is not by itself objectionable, is qualified by the obvious limitation that it may not be deployed in such a manner as to invade any other constitutional protection. One such inhibition is a logical projection of the rule that it is not the legitimate purpose of a Grand Jury inquiry to “create” new crimes in the course of its proceedings (People v Tyler, 46 NY2d 251, 259, supra). This court believes that if a witness chooses voluntarily to run one risk of contempt in the assertion of his constitutional claims, his election so to do should not be avoidably encumbered by the forced assumption of a different and reparable risk of contempt which the witness did not intend to run, only because the prosecutor, in his effort to extract the truth, camouflages the risks to make them indistinguishable, so that the witness cannot take the one he wants without taking them all to ensure inclusion of that one. The option confronting the witness — unintentionally to assume irreparable risks or else to- waive his constitutional claims — is not a predicament which conscionably may be imposed upon him as a weapon of truth trapping. Specifically, if a witness chooses to hazard contempt by refusal to answer questions which were in fact derived by electronic eavesdropping, because he believes that their illegitimacy will be established by final appeal, the choice is his to make; but it does not follow that he also intended or chose to run the same risk as to questions which were not in fact generated by such eavesdropping. *939 Indeed, such an additional peril would be illogical since he could not possibly prevail. There is no way in which the supposed interception could be found invalid if it never existed to begin with. The peril of contempt would not be a risk but a certainty. This certainty of conviction should not be imposed upon the witness by shackling it to the risk he chooses to take respecting the questions which were derived by interception, through his ignorance of the source of the questions which the prosecutor can readily alleviate, but which the witness cannot overcome, except by speculation on the existence or nonexistence of the challenged source.
A policy against encumbrance of the witness with risk of speculation was presaged under somewhat different facts in People v Mulligan (40 AD2d 165, 167), where the court noted that: “A Grand Jury witness who, as above noted, cannot move to suppress evidence in that proceeding, should not be required to speculate as to the source of the questions propounded or to anticipate a criminal contempt indictment.” Although procedure has been elaborated since Mulligan by the practice of informing the witness prior to interrogation before the Grand Jury of the existence of electronic surveillance, the issue is whether its development is a sufficient and meaningful improvement if it perpetuates his ignorance of the wiretap origin of each particular question separately. A major stride was taken in the Appellate Division decision in People v Einhorn (45 AD2d 75). Although nominally reversed by the Court of Appeals (35 NY2d 948), reversal was predicated upon the narrow ground that the defendant had not asked to be taken before a Justice for a hearing on the legality of the order for electronic surveillance — a waiver rather than an exercise of his defense. However, the Court of Appeals confirmed the existence of the defense which had been articulated by the Appellate Division, disturbing the result only because the defense had been misapplied to the facts of the case, but affirming the principle. Although the issue in Einhorn was not whether disclosure of electronic origin is required as to each separate question, the rationale of the decision is consistent only with that result. That rationale precluded imposition upon the witness of the risk of *940 speculation. Justice Capozzoli writing for the court said (45 AD2d 75, 77-78, supra): “In the case at bar the record shows that the defendant made it very clear that his refusal to answer questions put to him was ‘because my testimony would constitute a disclosure of the contents or fruits of an illegal electronic surveillance’. Any fair-minded person must admit that this language served notice upon all concerned that the defendant was relying upon the prohibition of section 2515 and was raising a claim that the evidence sought from him was inadmissible in grand jury proceedings. Once he raised that claim, it was the duty of the People to ‘ “affirm or deny the occurrence of the alleged” illegal interception’. (Gelbard v. United States, supra.) The trial court was in error when it intimated in its decision that the defendant acted at his peril in trying to guess what the facts were. He was entitled to more than a guess. He was entitled to truthful information as to whether the questions asked of him were or were not based on illegal wiretaps and it was the duty of the People to furnish that information before the grand jury.” Later in the decision, the court approving the procedure utilized in Matter of George (74 Misc 2d 359), observed (supra, at p 80) that in that case:
“There was no guesswork expected of the witness. He was properly informed and would have acted at his peril if he did not comply with the order directing him to testify.
“To say that no harm can come to the witness who faces such a crucial decision, because he can always have a suppression hearing in conjunction with his trial for contempt, is to overlook the fact that the time for the witness to have the information which, according to Federal-law he is entitled to have, is during the grand jury proceedings, when he is to make his choice as to whether he will or will not answer questions propounded to him. If we agree that the witness has the right to decline to answer questions based on illegal wiretapping, then how can that witness know whether the wiretap is legal or illegal if the People refuse to tell him whether wiretaps were used at all?” That reasoning can have no vitality if the right can be diluted by an undifferentiated disclosure that “some” of the questions are the product of electronic surveillance, but the *941 particular ones must be surmised, at the witness’ peril. It is just those particular questions which are precisely the gravamen of the separate counts of the contempt indictment, some of which resulted because the guesswork failed. The issue thusly becomes distorted: instead of a probate of the legality of the wiretap order, it becomes a contest of the witness’ prowess at guessing. The risk is his alone. Vulnerable is the right to test the legality of even the questions which do subsequently prove to have been germinated by the wiretap, potentially undermined by the fear that a guess as to their origin may be wrong.
The witness’ claim that he cannot distinguish those questions derived, from those questions not derived, from wiretapping must not, however, be patently sham. A frivolous claim of such ignorance will not shield him if the question is obviously untainted. In Lanza v New York (370 US 139, 145, 146), the United States Supreme Court ruled that where it was “apparent on their face” that questions were not dependent upon intercepted conversations, refusal to answer could not be predicated upon the interception.
It is true that in People v McGrath (46 NY2d 12), the decision in the Appellate Division (57 AD2d 405, 406) indicates that the prosecutor stated that “ ‘[I]t is anticipated that some of the questions which will be asked of you *** may be derived from electronic eavesdropping’”. But conviction did not follow from a refusal to answer. Contrariwise, McGrath, although professedly “under protest,” waived any right to silence he might have had because of illegal eavesdropping and proceeded to answer. His conviction of contempt resulted from equivocation, evasion and falsity in his testimony (Penal Law, § 215.51), an independent offense. Accordingly, the case is no authority on contempt arising from refusal to testify after receipt of information that “some” of the questions may be derived from electronic eavesdropping. Nor was that issue adjudicated or raised. At bar it is crucial.
In People v Lopez (91 Misc 2d 157, 161), Justice Polsky said that “The law does require the witness to selectively assert his claim and by doing so he cannot be forced onto the horns of the dilemma the People seek to create.” *942 However, that impermissible dilemma which was the environment in which the dictum was cast and from which it cannot be isolated, was the opposite of the dilemma in this case. In Lopez, the defendant (himself an experienced criminal lawyer) was sufficiently sophisticated to recognize that some of the questions were not sired by spurious surveillance, and he answered them, from which the prosecution contended that he had thereby waived his right to object to other questions which he claimed did have such a genesis — an obvious fallacy. The witness was properly required selectively to assert his claim because he did not take the position that he needed to be informed which questions were and which were not the result of wiretapping. That he needed and demanded no such information results in no ruling that he would not be entitled to it if he did need and demand it. But the latter situation was the one Leo asserted, namely that he could not distinguish those questions which were and were not born of electronic surveillance and would, without such disclosure to him, be waiving his right to object to those so derived. The dilemma sought to be imposed on Lopez was a supposed intentional waiver by answering those questions known to him to be unobjectionable, while the dilemma posed to Leo was possible inadvertent waiver by answering those questions unknown to him to be possibly objectionable. While it may be proper to require selective assertion of the claim when the witness can do so, it is improper to require it where he cannot do so.
The situation in People v Pomerantz (46 NY2d 240, 249, supra) was different. There the court ruled: “Nor should the prosecution be required to confront defendant with the recording, lest he conform his testimony to what was already known and fail to add to the prosecutor’s knowledge”, and then observed: “In fact, on the trial, as the prosecutor argues, defendant, when then confronted with the recording, tailored his testimony to attempt vainly to overcome the damning proof against him.” However, that statement does not, on its face, relate to an Einhorn issue, because it does not appear that Pomerantz had asked whether he had been electronically recorded. He had himself requested immunity. Moreover, the court, in consider *943 ing the objection on appeal that Pomerantz had not been confronted with the recording before the Grand Jury, appears to have been referring to an objection that the transcript was not- read to the Grand Jury, which is a broader objection than just the fact of its existence.
Upon the foregoing considerations and upon all the plenary evidence, without reliance on the doctrine of law of the case to this criminal action (see People v Blake, 35 NY2d 331, 334,335), the court finds the defendant guilty of the first and fifth counts of the indictment, and not guilty of the second, third, fourth, sixth, and seventh counts.
The first count charges. refusal to answer a question, which the court finds apparent on its face not to be dependent upon any intercepted conversation (Lanza v New York, 370 US 139, supra).
The fifth count of the indictment relates to the risk that the defendant intended to take in order to litigate on appeal his right not to answer a question derived from electronic surveillance which he judges to be unauthorized.
As to the second, third, fourth, sixth, and seventh counts, the court finds that, as the prosecution concedes, the questions to which they relate were not founded upon electronic surveillance, and that the prosecutor, although asked to specify whether they were so derived and concededly knew at the time that they were not so derived, purposefully withheld that information from the defendant. Because he was deprived of an informed choice by the interrogators’ failure to differentiate factually the source of the questions covered in those counts from the questions covered in the fifth count, the defendant’s willful intent to contemn was in the circumstances negated, mandating acquittal.
[Portions of opinion omitted for purposes of publication.]