OPINION OF THE COURT
Chief Judge Breitel.
This is another appeal testing the validity of a perjury prosecution for testimony given before a Grand Jury (see People v Tyler, 46 NY2d 251, decided herewith; see, also, People v Schenkman, 46 NY2d 232, decided herewith). Defendant, a supplier of paper goods and household chemicals to nursing homes, was convicted after jury trial on three counts of perjury in the first degree (Penal Law, § 210.15). He was sentenced to indeterminate concurrent terms of three years on each count. The Special Prosecutor for Nursing Homes appeals from the Appellate Division’s unanimous reversal and dismissal of the indictment.
Involved is defendant’s false testimony before a Kings County Grand Jury investigating fraud in the nursing home industry in New York. The primary issue is whether a prosecution for perjury before the Grand Jury is defective solely because the false testimony concerns an out-of-State meeting, arranged by the Special Prosecutor, between defendant and an out-of-State nursing home operator working as an undercover agent. Also at issue is whether the prosecutor’s questioning about the meeting, at which a scheme to defraud the Medicaid program was discussed, was aimed solely or substantially at trapping defendant into giving false testimony.
 The order of the Appellate Division should be reversed. The meeting was material to the authorized substantive investigation of the Grand Jury, namely, exposure of corruption in the New York nursing home industry. Resort to an undercover agent to elicit defendant’s knowledge is a legitimate investigatory technique. The meeting which took place in New Jersey disclosed defendant’s familiarity, with fraudulent New York practices. Moreover, the prosecutor’s questioning was not a trap to support a prosecution for perjury. The subject matter of the meeting should have made it memorable, and the prosecutor’s repetition and restatement provided ample cues to stimulate defendant’s recollection (see People v Schenkman, 46 NY2d 232, supra, decided herewith). If indeed a trap was set, it was aimed not at perjury, but at *244 flushing out the truth. (Compare People v Tyler, 46 NY2d 251, supra, decided herewith.)
In connection with the investigation of nursing home operators and their suppliers, the Special Prosecutor discovered widespread scandalous abuse of the Medicaid reimbursement program. One common scheme was for suppliers to provide customers with inflated or fictitious bills to cover “kickbacks”. Although full Medicaid reimbursement would be claimed and received by the home, the overpayment made by the home to the supplier would eventually be shared by the perpetrators.
To further the investigation the prosecutor enlisted one Ira Feinberg, then recently convicted in Federal court on charges of securities fraud and conspiracy. It was agreed that Feinberg, an owner of nursing homes, would invite several supply companies to the newer of his two New Jersey facilities. The true purpose of the meetings was to discover involvement by suppliers in illegal kickback schemes in New York State.
The Pomerantz Paper Corp. of Brooklyn, of which defendant is president, has been supplying nursing homes with paper goods and household chemicals since 1971. Defendant’s company does business with more than 30 homes, the majority located in the New York City metropolitan area. It also has about eight customers in New Jersey. At the invitation of Feinberg, defendant visited Feinberg’s Manor Nursing Home in Emerson, New Jersey, on July 15, 1975.
Following a discussion of the products needed, defendant was asked about "special deals”. Although he first skirted the subject, defendant ultimately described an “arrangement” whereby a "certain percentage [is] put onto the bill”. He also explained the more risky use of fictitious invoices. Offering to "work something out” with Feinberg, defendant conceded that he would favor Feinberg with benefits he was conferring on others. The conversation was surreptitiously recorded.
On March 1, 1976, a Special Grand Jury was impaneled in Kings County to investigate nursing home corruption. Of particular interest was the extent to which suppliers were giving kickbacks. Defendant was called to testify on May 21, 1976, 10 months after his meeting with Feinberg. On his own request, he was granted immunity.
After some inquiry into defendant’s personal background and the operation of his company, the prosecutor had defendant list the nursing homes he serviced and the particular persons with whom he dealt. Questions about other homes and *245 persons connected with them followed. With respect to Feinberg defendant was asked:
"Q. Have you ever done any business or solicited any business from the Manor Nursing Home in Emerson New Jersey?
"A. I don’t remember.
"Q. That is run by a Mr. Ira Feinberg?
"A. I don’t recall.
"Q. Have you ever met Mr. Feinberg?
"A. I don’t remember.
"Q. Mr. Feinberg also runs the Manor Nursing Home in Tenafly New Jersey?
"A. I don’t know where Tenafly is.
"Q. Well, have you ever met Mr. Feinberg?
"A. I don’t remember.
"Q. Is it possible?
"A. Sure, it is possible.”
A few other names were mentioned, but the questioning returned to Feinberg:
"Q. Once again I want to ask you whether you have ever met or solicited business from Mr. Ira Feinberg who had or has nursing home interests in among others the Manor Nursing Home at Tenafly, New Jersey, and the Manor Nursing Home in Emerson, New Jersey?
"A. I don’t remember, I don’t remember, the name does not strike — the name, I don’t remember the name.
"Q. Is it possible?
"A. It is — sure, it is possible.
"Q. Well, how likely is it?
"A. I don’t know.
"Q. Do you have any recollections at all of meeting Mr. Ira Feinberg?
"A. None at all. I don’t know where those places are.”
Defendant’s familiarity with kickbacks was the object of extensive examination. Defendant denied not only participating in wrongdoing, but asserted that he had only newspaper knowledge. The following are but a few examples among many:
"Q. Have you ever heard of or do you have any personal *246 knowledge of the alleged practice in the nursing home industry of vendors inflating their bills to nursing homes?
"A. Just what I read in the papers.
"Q. You have no personal knowledge of that practice?
"A. No, sir.
"Q. You have never engaged in that practice yourself?
"A. No, no sir.
"Q. Have you ever heard of or do you have any personal knowledge of the alleged practice in the nursing home industry of vendors giving extra bills or invoices to nursing homes?
"A. Just what I read in the paper.
"Q. You have never engaged in that practice yourself?
"A. No.”
"Q. I want to be very clear on this, to the best of your knowledge has any nursing home owner, operator, administrator, or other employee that you have solicited business from ever in words or substance requested or asked you for any special deals so that he can make a few dollars?
"A. I cannot remember every person who I dealt with in business if that ever came across.”
"Q. Mr. Pomerantz, have you ever said, suggested, or told any nursing home owner, operator, administrator, or other employee in words or substance that he can have 10% added onto his bills?
"A. You’ve asked me the question four times already.
"Q. Please answer. This will be the last time in that form at least.
"A. I must say I don’t recollect ever having offered anyone in anyway any type of kickback.”
"Q. Have you ever said, suggested, or acknowledged in any way to any nursing home owner, operator, administrator, or other employee that you would add on 10% to their bills and then give them back the 10% in cash?
"A. I cannot recall making such a statement.
"Q. If you had made such a statement you would recall it, would you not?
"A. I sure would.
* * *
"Q. I want you to listen to my questions very carefully *247 because they are different. Have you ever told any nursing home owner, operator, administrator, or other employee in effect that you give other people in the nursing home industry 10% inflated bills?
"A. To the best of my recollection I don’t remember ever making such a statement.
"Q. Have you ever said, suggested, or told any nursing home owner, operator, administrator, or other employee that when you make such deals it is on that basis, meaning on the basis of a 10% inflated bill?
"A. To the best of my recollection I don’t remember making such a statement.”
In a last effort, the prosecutor raised Feinberg’s name for the third time, and, consistent with his earlier responses, defendant said he did not recall meeting him.
At one point in the questioning defendant asked to speak to his lawyer. The prosecutor indicated he had only one further question. Although more than 20 questions followed, defendant did not repeat the request. Finally, before concluding, the prosecutor warned defendant he could be indicted for perjury, but defendant declined the invitation to change his testimony.
A three-count indictment for perjury in the first degree resulted. Count one charges defendant with falsely denying knowledge of kickbacks; the thrust of count two is that defendant falsely stated he never discussed kickbacks with operators; and count three relates to defendant’s statements that he had never offered to arrange a kickback scheme.
At trial the principal witness for the People was Feinberg. Defendant explained his Grand Jury testimony about Feinberg as a lapse in memory. According to defendant, with the exception of Feinberg, he had never offered kickbacks to an operator. He only “play[ed] along” with Feinberg so as not to "turn him off”.
Neither defendant nor the Appellate Division question the Special Prosecutor’s authority to investigate defendant as a supplier of nursing homes in New York. As in People v Tyler (46 NY2d 251, supra), also decided today and involving a conviction for perjury before the Grand Jury, it is the methods employed by the prosecutor that are challenged. Dismissal of the indictment was required in Tyler because defendant’s false answers were in response to questions designed substantially to extract perjury, manifesting no palpable interest in *248 evoking facts material to the authorized underlying inquiry. In this case, however, the objections do not withstand analysis.
There is no basis for arguing that the prosecutor improperly enlisted the aid of a convicted felon to determine whether defendant had valuable knowledge. The use of an undercover agent to expose corruption is an acceptable and traditional investigatory technique (see, e.g., Lewis v United States, 385 US 206, 210, reh den 386 US 939; cf. Model Penal Code, § 2.10, Comment 2 [Tentative Draft No. 9, 1959]). Nor is there basis for criticizing the situs of the meeting. Obviously, neither the Special Prosecutor nor the Grand Jury would purport to act on corruption beyond the borders of New York. It does not follow, however, that conversation in New Jersey with New York content is irrelevant to investigation of crime in New York.
Defendant’s conversation with Feinberg, albeit in New Jersey, revealed much about practices in New York. In addition to detailing how bills would be inflated by 10% to defraud authorities, defendant described the use of fictitious receipts for an even higher illegal return. Also potentially useful to the authorities was defendant’s explanation of how a profit of more than 10% could be made on chemicals, since chemicals were a "blind spot” with the regulatory authorities.
At no point did defendant suggest that the practices he was describing were limited to New Jersey. In fact, the majority of homes serviced by defendant are in New York. It is true that the New Jersey meeting did not produce a list of suspected New York operators. That, however, was precisely why defendant was called before the Grand Jury. Defendant was by no means the sole or any target of the investigation; indeed, he was granted immunity for his testimony. It was information about those accepting illegal kickbacks that the prosecutor wished and hoped to obtain from defendant. Put another way, the prosecutor, in calling defendant before the Grand Jury based on the information uncovered by Feinberg, had a legitimate law enforcement objective material to an authorized substantive investigation in New York (compare People v Tyler, 46 NY2d 251, supra, decided herewith).
The contention that the prosecutor’s questioning was aimed substantially at trapping defendant into giving false testimony is baseless. In sharp contrast to the interrogator in the Tyler case, the prosecutor questioning defendant did not limit his inquiry to peripheral details of a transaction not *249 demonstrated to be significant or otherwise memorable. The recording made by Feinberg proves that a corrupt arrangement was in fact discussed at the New Jersey meeting. The encounter was thus a significant one, and would be memorable 10 months later, even if, incredibly, it was defendant’s first conversation about nursing home corruption. If it were not, then defendant’s other denials were patently false. There is no escape from his dilemma.
Even had defendant, improbably, forgotten his meeting with Feinberg, the prosecutor provided ample cues to stimulate defendant’s recollection. Unlike the interrogator in the Tyler case (supra), who evinced no interest in having defendant give a convincing narrative of the meeting about which he was questioned, the prosecutor questioning defendant raised Feinberg’s name three times, provided the name of the nursing home Feinberg was about to open, and asked defendant whether he had ever met Feinberg in Emerson, New Jersey. That the precise date of the meeting was not given to defendant, or the transcript of the recording read, is immaterial. It is unreasonable to suggest that defendant’s recollection would have improved had the exact meeting date been given to him. Nor should the prosecutor be required to confront defendant with the recording, lest he conform his testimony to what was already known and fail to add to the prosecutor’s knowledge. In fact, on the trial, as the prosecutor argues, defendant, when then confronted with the recording, tailored his testimony to attempt vainly to overcome the damning proof against him.
On the general topic of illegal kickbacks, the prosecutor, as the quoted excerpts indicate, unrelentingly pressed defendant. Much like the prosecutor in People v Schenkman (46 NY2d 232, supra, decided herewith), the key questions were repeated, restated, and elaborated upon until it was apparent that further effort was fruitless. With respect to the 10% figure, for example, even defendant complained: "you’ve asked . me the question four times already.” More than 80 questions, consuming over 20 pages of testimony, were put to defendant. The determination to extract whatever pertinent information defendant possessed could not be more evident.
It is true that in summation the prosecutor admitted wanting "to trap Joshua Pomerantz” and "get knowledge about what he did.” Critical in distinguishing this case from the Tyler (supra) case, however, is that it is not into giving false testimony that the questioner sought to trap defendant. Here *250 the “trap”, as the prosecutor truly said, was aimed at ferreting out the facts. In short, the interest in furthering the investigation is manifest, and the technique employed unobjectionable.
One more matter should be addressed. The three counts of perjury involved 55 false statements, 54 of which had been given by the time defendant asked to talk with his lawyer. The one false statement made by defendant that followed his request is merely the last of 32 assignments of perjury charged in count two. Failure to honor the request was therefore a triviality. The Appellate Division’s suggestion, moreover, that confusion about the scope of his immunity prompted defendant to request to see his lawyer, is unsupported in the record.
This case, in sum, presents the counterpoint to People v Tyler (46 NY2d 251, supra, decided herewith). Both the meeting in New Jersey and the questions put to defendant before the Grand Jury were aimed at uncovering, through defendant, corruption in the New York nursing home industry. That a perjury conviction eventuated cannot be assigned to the prosecutor; that was defendant’s own doing. The examiner met his burden of demonstrating that the interrogation before the Grand Jury had a legitimate substantive investigatory purpose. For all the reasons indicated, there was no abuse of the Grand Jury process and oath by the prosecutor.
Before concluding, it is essential to add a caveat. An investigatory examination which may seem to parallel what is approved in this case would not stand if on the record it were demonstrable that what was ultimately involved was a sophisticated facade to trap the defendant into a new crime of perjury or contempt, and not to establish evidence of antecedent crime. The court is concerned with substance, not form.
Accordingly, the order of the Appellate Division should be reversed and the matter remitted to the Appellate Division for review of the facts.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order reversed and the case remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein.