OPINION OF THE COURT
Chief Judge Breitel.
Based on testimony he gave before a Grand Jury, defendant, a Supreme Court Justice, was convicted after jury trial on three counts of perjury in the first degree (Penal Law, § 210.15). He was sentenced to probation. The Special Prosecutor appeals from the Appellate Division’s unanimous reversal and dismissal of the indictment.
There should be an affirmance.
 Involved are defendant’s false answers to questions limited to the outward details of place and time of a single meeting between defendant and a reputed criminal character. The primary issue is whether a prosecution for perjury may be based on such false answers where the prosecutor, in his questioning, demonstrated no palpable interest in eliciting facts material to the authorized substantive investigation of antecedent crime or official misconduct. A secondary issue is whether the false answers about peripheral details of the single meeting may support a perjury prosecution without the prosecutor laying enough of a foundation to recall to the witness’ mind what, without some prodding, may have in truth escaped the witness’ recollection. In resolving the issues it is concluded that the conviction may not stand, and the indictment was properly dismissed as a matter of law.
First elected to the Civil Court in 1967, defendant became a Supreme Court Justice in January, 1970. Admitted to the Bar sometime after World War II, for the 18 years before he became a Judge defendant had been a lawyer practicing largely on his own and devoting about 50% of his time to criminal matters.
In February, 1975 an Extraordinary Grand Jury was charged, among other things, with investigating the relationship of defendant with certain known gambling figures. The inquiry, which included 20 sessions at which 22 witnesses *255 were heard, was not concluded until Ocotber, 1976. Among the gamblers was one Raymond Marquez, also known as "Spanish” Raymond, the reputed head of one of the largest illegal gambling operations in New York. The Grand Jury was informed that Marquez, who was released from Federal prison in April, 1975, had been convicted of both Federal and State crimes, including interstate racketeering, gambling policy, and contempt.
Each of the counts charged in the instant indictment for perjury before the Grand Jury arises out of defendant’s answers to questions concerning a single meeting with Marquez. According to the acting forewoman of the Grand Jury, the inquiry was aimed at uncovering any bribery, bribe receiving, or official misconduct.
Three police officers involved in an extensive personal surveillance of defendant testified to the Grand Jury that on May 16, 1975, after the Grand Jury had been convened, they saw Marquez in defendant’s company. According to the officers, after some activity that suggested he may have been waiting for someone, defendant met Marquez and his wife near Lincoln Center in Manhattan. They drove about 10 blocks in defendant’s automobile to Patsy’s Restaurant on West 56th Street, and remained there for over an hour. Upon leaving, defendant and Marquez allegedly spoke for 10 minutes, while Mrs. Marquez sat in defendant’s automobile. Defendant then drove the two back to where their own automobile was garaged. Substantially the same testmony was given by the officers at trial.
Defendant appeared before the Grand Jury on four occasions, and on two was questioned about Marquez. Other areas of inquiry were defendant’s background and how he came to be a Judge, defendant’s acquaintance with other reputed gamblers, and bail applications granted by defendant out of the ordinary courtroom setting.
On March 2, 1976, defendant’s second appearance, defendant testified that he knew Marquez as a man who had been convicted "some years ago for policy”, and recalled representing him as a lawyer "in the fifties” in a case that "had something to do with gambling.” When asked about contacts with Marquez since defendant had become a Supreme Court Justice, defendant denied communicating with him. He remembered, however, that as he was going to his courthouse *256 chambers one day he saw Marquez being escorted by Marshals to Federal court.
Marquez was not mentioned when defendant appeared before the Grand Jury for the third time on May 18, 1976. In his final appearance two days later, however, Marquez was again the subject of inquiry. This time, when asked about communications with Marquez, defendant, who later explained at trial that a discussion he had had with his wife following his earlier appearance had refreshed his recollection, recalled the May 16 meeting:
"Q. [Y]ou testified before that you saw him on occasion when he was being transported by federal marshals. You said that was the only time you’d seen him since you’d become a judge. Is that the occasion you’re talking about?
"A. No, that’s not the occasion I’m talking about.
"Q. What is the occasion that you’re talking about?
"A. I saw him on an occasion when he was with his wife on 58th Street in Manhattan.
"Q. When was that?
"A. I couldn’t fix the dates. Probably somewhere around May. May of '75, somewhere around there.
"Q. Can you describe that in any more detail, that meeting or encounter or whatever it was on 58th Street?
"A. Yes. It was outside of Patsy’s Restaurant. I think that’s where it was.
"Q. What were you doing? Were you walking down the street, driving, in the restaurant? What was—
"A. I was on my way into Patsy’s.
"Q. What happened?
"A. I saw him and his wife.
"Q. What did you do?
"A. We greeted each other, asked him how he was. He asked me how I was. Asked me how things were getting along, and I asked him the same thing.
"Q. This was out on the street?
"A. That was on the street.
"Then they walked into Patsy’s and I walked into Patsy’s.
"Q. Were you alone or with anyone else?
"A. I was alone. I was waiting for my daughter.
"Q. What happened after you went into Patsy’s?
*257 "A. I think I had a drink.
"Q. Was there a bar there, or did you have it at the table.? "A. Sitting right at the entrance of the door, I had a drink at the door.
"Q. Did you have a drink alone?
"A. No. He and his wife sat down.
"Q. How long did that take?
"A. About ten or fifteen minutes.
"Q. What happened then?
"A. I got up and left.
"Q. And they remained in the place?
"A. I believe so.
* * *
"Q. Did you have a previous arrangement to meet with Mr. Marquez at that location?
"A. No, sir.
"Q. It was purely chance?
"A. Yes, sir.
"Q. When you arrived there did you — withdrawn. What did you discuss during the course of that meeting with Mr. Marquez?
"A. How he was, basically.
"Q. Had he recently come out of prison?
"A. I understood that he had, yes.
"Q. Was that part of the discussion?
"A. Yes.
"Q. Anything else except his health?
"A. That’s all. Health and what he planned to do.
"Q. Did he tell you what he planned to do?
"A. He said he intended to take it easy.
"Q. And that was the extent of the conversation?
"A. In substance.
"Q. Can you remember anything else that was discussed?
"A. No, I can’t, because it was just chit-chat.
"Q. Did he discuss with you any matters that were in the courts at that time?
"A. No, sir.
*258 "Q. Did you discuss any of the — did he discuss the fact that the people in his organization had been arrested?
"A. No, sir.”
At this final appearance, defendant also corrected his earlier testimony to reflect that his former representation of Marquez related not to gambling, but to a violation of probation arising out of an assault.
A four-count indictment for perjury in the first degree followed. As noted, the charges are entirely based on defendant’s answers to questions about the single meeting with Marquez. The first count charges defendant with falsely stating that he had not "talked to Marquez” since becoming a Supreme Court Justice. That count, presumably because of defendant’s later recantation, resulted in an acquittal, but defendant was convicted of the three remaining counts. Count two alleges that "upon being asked where he saw Marquez for the first time on May 16, 1975, [defendant] testified that it was in front of Patsy’s Restaurant.” Under count three, it is asserted that defendant testified that his meeting with Marquez "had lasted about ten to fifteen minutes.” The fourth count alleges that "upon being asked what happened after conversing with Marquez in Patsy’s Restaurant, [defendant] testified that * * * he exited the Restaurant and left Marquez inside the premises.” The surveillance team, as observed earlier, had testified that defendant, after driving the couple 10 blocks to the restaurant, talked to them there for over an hour, and upon leaving, but before driving them to their garage, spoke to Mr. Marquez while Mrs. Marquez waited in defendant’s automobile.
Among the grounds for reversal adopted by the Appellate Division were that in counts two and three the materiality necessary to a conviction for perjury in the first degree was lacking and that in counts two and four the falsity of the statements alleged was insufficiently proved. Since the challenged interrogation amounted, on the whole, to an impermissible "perjury trap”, neither ambiguity nor insufficiency of evidence, usually issues of fact resolvable by the jury, need be discussed (see People v Dunleavy, 41 AD2d 717, affd 33 NY2d 573; cf. People v Goldman, 21 NY2d 152, 160, app dsmd 392 US 643, mot for reh den 393 US 899). Nor need materiality be discussed.
The primary function of the Grand Jury is to uncover crimes and misconduct in public office for the purpose of *259 prosecution (see NY Const, art I, § 6; CPL 190.65, 190.55). False testimony before the Grand Jury, then, especially by the holder of public office, is a grave matter affecting the public interest and the administration of justice. It is not properly a principal aim of the Grand Jury, however, to "create” new crimes in the course of its proceedings. Thus, where a prosecutor exhibits no palpable interest in eliciting facts material to a substantive investigation of crime or official misconduct and substantially tailors his questioning to extract a false answer, a valid perjury prosecution should not lie (see Brown v United States, 245 F2d 549, 554). Since no legitimate investigatory function is discernible in questioning designed primarily or solely to support a perjury prosecution against the witness, it cannot be said that the responsive testimony, albeit false, frustrates any authorized purpose of the Grand Jury.
It is not unprecedented for an improper purpose to invalidate that which is otherwise lawful. There is an analogy in the tort field. Where there is an "abuse of process”, that is, a "misuse or perversion of regularly issued legal process for a purpose not justified by the nature of the process”, a cause of action will lie (Board of Educ. v Farmingdale Classroom Teachers Assn., 38 NY2d 397, 400). It has also been suggested that abuse of the power of the Grand Jury to investigate and indict for criminal acts may fatally infect the proceeding (see Matter of Cunningham v Nadjari, 39 NY2d 314, 318). Recognized is that it is not just the target of the abuse who is offended, but the administration of justice (see Board of Educ. v Farmingdale Classroom Teachers Assn., supra, pp 400-401).
The absence of a legitimate purpose to the inquiry also makes suspect the administration of the oath to defendant (see Matter of Nigrone v Murtagh, 36 NY2d 421, 426 [caveat]). It is elementary that there must be a validly administered oath to establish perjury (Penal Law, §§ 210.15, 210.00, subds 3, 5; O’Reilly v People, 86 NY 154, 157, 161; 70 CJS, Perjury, §24). Where the questioning is not intended to further the Grand Jury investigation, but, instead, is aimed substantially at trapping the witness into giving false testimony, the validity of the oath previously administered is questionable.
Ordinarily, whether a trap primarily or solely to support a prosecution for perjury against the witness was set by the prosecutor raises a question of fact (see Matter of Nigrone v Murtagh, 36 NY2d 421, 426, supra [caveat]). The questioning in the instant case, however, was an unmitigated effort to trap *260 the witness on minor outward details of a single meeting with a reputed criminal figure. There was no attempt to establish that the meeting was pertinent to a proper substantive goal of Grand Jury investigation. The meeting might well have been a chance encounter at which the former lawyer chatted with his ex-client. Or, it might have been planned to discuss matters inappropriate between one now a Judge and the other a convicted gambler, even if he were a former client. More to the point, the meeting would then have had more of a suspect character and probably would have related to the substantive criminal investigatory goals of the Grand Jury.
The prosecutor evinced minimal or no interest in establishing the materiality of the meeting. Almost as if he were conducting only a quiz to test memory or recall, he devoted most of his questions, as the excerpt quoted earlier indicates, to the logistical details of the May 16 encounter, facts contemporaneously documented by the surveillance team.
It is true that after an extended series of questions about where defendant and Marquez met, how long they were together, and how they parted, defendant was asked what they spoke about. And, some directed, if isolated, questions, such as whether they discussed matters then in the courts or that people in "the organization” had been arrested, were posed. Seemingly content with defendant’s description of an innocuous encounter, however, at no time did the prosecutor, either by repetition, restatement, or elaboration, press defendant into giving a convincing narrative of what indeed went on at the restaurant. Yet, it is the content of the meeting which would determine whether the outward details were of any significance and, more important, whether substantive inquiry should be pursued. In sum, there is demonstrated no palpable effort to establish, either from the Grand Jury testimony or from the evidence at the trial, that the meeting was material to the Grand Jury investigation. In such a context, false answers to questions limited to peripheral details of time and place may not support a prosecution for perjury.
Also critical is that, upon hearing defendant’s version of the outward details of the May 16 meeting, the prosecutor failed to confront defendant, or otherwise stimulate his memory, if only by limited cues, with some of the contrary facts acquired from the surveillance team. Such cues are not to inform the witness of the information already acquired, but to make certain that the witness is not failing sincerely to recall *261 details of no memorable significance. To establish that defendant’s assertion that he first met Marquez "outside of Patsy’s Restaurant” was knowingly false, and not just a lapse in memory, some slight effort to stimulate defendant’s recollection should have been made. The same may be said of defendant’s assertion that he sat with the Marquezes for only 10 or 15 minutes, and that when he left the restaurant the Marquez couple remained.
It is not so much that the witness deserves an opportunity to refresh his recollection; it is that the foundation established by stimulation of recollection bears on resolution of the ultimate issue: whether defendant is deliberately falsifying. Indeed, if the meeting were no more than benign but questionable socializing between former lawyer and client, details would not likely be remembered or easily recalled. This does not mean that the kind of foundation required to impeach a witness with a prior inconsistent statement is indicated. Much less is indicated, simply enough to exclude the innocent lack of recollection or memory of a peripheral detail not likely to be memorable.
That is not to say that a witness suspected of falsifying must be wetnursed, or that in every case a "last clear chance” to tell the truth must be afforded. A rigid rule would deny the prosecutor the right to exercise judgment. In inquisitorial investigations particularly, just as on trial cross-examination, indirect questioning is characteristic and permissible. But the nature, and especially the intrinsic significance, or insignificance, of the event to be recalled will, almost invariably, be critical in determining the cues, if any, the prosecutor should provide for the witness, if it is the truth that is being sought.
It is true that when defendant met with Marquez, the Grand Jury investigation had already been underway, and inquiry concerning bail applications handled by defendant was being made by the State Commission on Judicial Conduct. That is hardly enough to compel the conclusion that the meeting, albeit between a Supreme Court Justice and a recently released Federal prisoner, was other than harmless, even if perhaps indiscreet. And no more was established by the prosecutor. But even if the encounter between former lawyer and client should have been memorable, either because it involved a transaction of significance, or because it was at that point so unusual for defendant in light of his then experience and associations, it is unrealistic to expect defen *262 dant’s recollection of the surrounding details to equal that of the surveillance officers who were making contemporaneous notes of defendant’s every step.
Put another way, it is not suggested that full disclosure of the information known to the prosecutor must have been made to defendant, especially if disclosure would reveal too much of how the investigation was conducted and how far it has proceeded. Yet, the examiner has an inescapable burden to provide a transcript which demonstrates that the witness is testifying falsely intentionally, rather than mistakenly, whether it is with respect to surrounding neutral details or to substantive matters relevant to an authorized investigation. The record in this case does not establish either intentional falsity or purposeful substantive inquiry. Thus, the only rational explanation for the tactics employed is the unacceptable one: that a perjury indictment, rather than the ascertainment of facts leading to substantive goals, was the object.
Nor is it suggested that defendant would have answered a more disciplined interrogation differently. That cannot be known. Nor should it be supposed that the mere anticipation of perjury in an inquiry would invalidate an indictment for the anticipated perjury. That would be unrealistic, and a boon to which perjurers are not entitled. How defendant might otherwise have responded, or whether a prosecutor could reasonably have hoped for more illuminating testimony, is not what ultimately determines the issues. Dispositive in this case is that the preoccupation with trapping defendant into committing perjury is unmitigated by substantive investigative goals. There was not even that little which might have presented a question of fact for the jury to decide. Dismissal of the indictment as a matter of law was thus proper.
Decided simultaneously with this case are People v Pomerantz (46 NY2d 240) and People v Schenkman (46 NY2d 232). Both cases provide appropriate comparison because in each similar issues concerning the questioning of witnesses before investigatory Grand Juries are involved. In both the excerpts from the questioning are given and illustrate properly authorized and conducted examination.
Accordingly, the order of the Appellate Division should be affirmed, and the indictment stand dismissed.
*263 Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed.