**Joshua POMERANTZ, Petitioner,**

v.

**The STATE OF NEW YORK,
Respondent.**

**No. 79 Civ. 353.**

United States District Court,
E. D. New York.

May 30, 1979.

Julia Pamela Heit, New York City, for petitioner.

Charles J. Hynes, Deputy Atty. Gen. of the State of N.Y. Office of the Sp. Prosecution for Nursing Home Investigation, New York City, for respondent; Richard D. Carruthers, Sp. Asst. Atty. Gen., New York City, of counsel.

## MEMORANDUM AND ORDER

PLATT, District Judge.

By Order to Show Cause dated February 13, 1977, returnable February 15, 1977, petitioner sought a stay of execution of the sentence imposed upon him on October 19, 1977, by the Supreme Court, Kings County, (Kooper, J.) and the setting of a reasonable bail pending a final determination of his petition for a writ of habeas corpus but, after a hearing, in a brief oral opinion from the bench this Court denied petitioner's application for a stay and bail and thereafter on March 2, 1979, a certified copy of the judgment of the Court of Appeals for this Circuit, affirming this Court's decision, was

filed in the Office of the Clerk of this Court.

Respondent now moves for an order dismissing petitioner's petition for a writ of habeas corpus upon the ground that the petitioner failed to establish therein that execution of the judgment of conviction rendered against him in the Supreme Court will be in violation of the Constitution or laws or treaties of the United States.

The facts in this case are succinctly summarized in the opinion of the New York Court of Appeals dated December 20, 1978,[1] reversing the Appellate Division, Second Department,[2] as follows (46 N.Y.2d 240–244, 413 N.Y.S.2d 290–292, 385 N.E.2d 1220–1222):

"In connection with the investigation of nursing home operators and their suppliers, the Special Prosecutor discovered widespread scandalous abuse of the Medicaid reimbursement program. One common scheme was for suppliers to provide customers with inflated or fictitious bills to cover 'kickbacks'. Although full Medicaid reimbursement would be claimed and received by the home, the overpayment made by the home to the supplier would eventually be shared by the perpetrators.

"To further the investigation the prosecutor enlisted one Ira Feinberg, then recently convicted in Federal court on charges of securities fraud and conspiracy. It was agreed that Feinberg, an owner of nursing homes, would invite several supply companies to the newer of his two New Jersey facilities. The true purpose of the meetings was to discover involvement by suppliers in illegal kickback schemes in New York State.

"The Pomerantz Paper Corp. of Brooklyn, of which defendant is president, has been supplying nursing homes with paper goods and household chemicals since 1971. Defendant's company does business with more than 30 homes, the majority located in the New York City metropolitan area. It also has about eight customers in New Jersey. At the invitation of Feinberg, defendant visited Feinberg's Manor Nursing Home in Emerson, New Jersey, on July 15, 1975.

"Following a discussion of the products needed, defendant was asked about 'special deals'. Although he first skirted the subject, defendant ultimately described an 'arrangement' whereby a 'certain percentage [is] put onto the bill'. He also explained the more risky use of fictitious invoices. Offering to 'work something out' with Feinberg, defendant conceded that he would favor Feinberg with benefits he was conferring on others. The conversation was surreptitiously recorded.

"On March 1, 1976, a Special Grand Jury was empaneled in Kings County to investigate nursing home corruption. Of particular interest was the extent to which suppliers were giving kickbacks. Defendant was called to testify on May 21, 1976, ten months after his meeting with Feinberg. On his own request, he was granted immunity.

"After some inquiry into defendant's personal background and the operation of his company, the prosecutor had defendant list the nursing homes he serviced and the particular persons with whom he dealt. Questions about other homes and persons connected with them followed. With respect to Feinberg defendant was asked:

Q. Have you ever done any business or solicited any business from the Manor Nursing Home in Emerson New Jersey?

A. I don't remember.

Q. That is run by a Mr. Ira Feinberg?

A. I don't recall.

Q. Have you ever met Mr. Feinberg?

A. I don't remember.

Q. Mr. Feinberg also runs the Manor Nursing Home in Tenafly New Jersey?

1. *People v. Pomerantz*, 46 N.Y.2d 240, 413 N.Y. S.2d 288, 385 N.E.2d 1218 (1978).

2. *People v. Pomerantz*, 63 A.D.2d 457, 407 N.Y. S.2d 723 (2d Dept. 1978). Following the decision of the Court of Appeals the Appellate Division, Second Dept., affirmed the petitioner's conviction, App.Div., 413 N.Y.S.2d 279 (1979). Motion for reargument on reconsideration, den'd, 46 N.Y.2d 940 (1979).

A. I don't know where Tenafly is.

Q. Well, have you ever met Mr. Feinberg?

A. I don't remember.

Q. Is it possible?

A. Sure, it is possible.

A few other names were mentioned, but the questioning returned to Feinberg:

Q. Once again I want to ask you whether you have ever met or solicited business from Mr. Ira Feinberg who had or has nursing home interests in among others the Manor Nursing Home at Tenafly, New Jersey, and the Manor Nursing Home in Emerson, New Jersey?

A. I don't remember, I don't remember, the name does not strike—the name, I don't remember the name.

Q. Is it possible?

A. It is—sure, it is possible.

Q. Well, how likely is it?

A. I don't know.

Q. Do you have any recollections at all of meeting Mr. Ira Feinberg?

A. None at all. I don't know where those places are.

"Defendant's familiarity with kickbacks was the object of extensive examination. Defendant denied not only participating in wrongdoing, but asserted that he had only newspaper knowledge. The following are but a few examples among many:

Q. Have you ever heard of or do you have any personal knowledge of the alleged practice in the nursing home industry of vendors inflating their bills to nursing homes?

A. Just what I read in the papers.

Q. You have no personal knowledge of that practice?

A. No, sir.

Q. You have never engaged in that practice yourself?

A. No, no sir.

Q. Have you ever heard of or do you have any personal knowledge of the alleged practice in the nursing home industry of vendors giving extra bills or invoices to nursing homes?

A. Just what I read in the paper.

Q. You have never engaged in that practice yourself?

A. No.

Q. I want to be very clear on this, to the best of your knowledge has any nursing home owner, operator, administrator, or other employee that you have solicited business from ever in words or substance requested or asked you for any special deals so that he can make a few dollars?

A. I cannot remember every person who I dealt with in business if that ever came across.

Q. Mr. Pomerantz, have you ever said, suggested, or told any nursing home owner, operator, administrator, or other employee in words or substance that he can have 10% added onto his bills?

A. You've asked me the question four times already.

Q. Please answer. This will be the last time in that form at least.

A. I must say I don't recollect ever having offered anyone in anyway any type of kickback.

Q. Have you ever said, suggested, or acknowledged in any way to any nursing home owner, operator, administrator, or other employee that you would add on 10% to their bills and then give them back the 10% in cash?

A. I cannot recall making such a statement.

Q. If you had made such a statement you would recall it, would you not?

A. I sure would.

\* \* \* \* \* \*

Q. I want you to listen to my questions very carefully because they are different. Have you ever told any nursing home owner, operator, administrator, or other employee in effect that you give other people in the nursing home industry 10% inflated bills?

A.  To the best of my recollection I don't remember ever making such a statement.

Q.  Have you ever said, suggested, or told any nursing home owner, operator, administrator, or other employee that when you make such deals it is on that basis, meaning on the basis of a 10% inflated bill?

A.  To the best of my recollection I don't remember making such a statement.

In a last effort, the prosecutor raised Feinberg's name for the third time, and, consistent with his earlier responses, defendant said he did not recall meeting him.

"At one point in the questioning defendant asked to speak to his lawyer.  The prosecutor indicated he had only one further question.  Although more than twenty questions followed, defendant did not repeat the request.  Finally, before concluding, the prosecutor warned defendant he could be indicted for perjury, but defendant declined the invitation to change his testimony.

"A three-count indictment for perjury in the first degree resulted.  Count one charges defendant with falsely denying knowledge of kickbacks; the thrust of count two is that defendant falsely stated he never discussed kickbacks with operators; and count three relates to defendant's statements that he had never offered to arrange a kickback scheme.

"At trial the principal witness for the People was Feinberg.  Defendant explained his grand jury testimony about Feinberg as a lapse in memory.  According to defendant, with the exception of Feinberg, he had never offered kickbacks to an operator.  He only 'play[ed] along' with Feinberg so as not to 'turn him off'."

Following his jury trial petitioner was convicted on three counts of perjury in the first degree (N.Y. Penal Law § 210.15) and was sentenced to indeterminate concurrent terms of three years on each count.  As indicated thereafter petitioner obtained a reversal and dismissal of the indictment from the Appellate Division, Second Department, which decision was then reversed by a New York Court of Appeals, and his conviction was then affirmed by the Appellate Division.

On this motion petitioner argues that (i) the immunity he received when questioned before the New York Grand Jury was not sufficient to protect him from prosecution in New Jersey; (ii) he was illegally deprived of his right to leave the grand jury room and consult with his attorney, and (iii) the prosecutor improperly trapped him into committing perjury.  While petitioner failed to raise any of these issues at the trial court level he did argue them in the appellate courts of New York and respondent does not contend that petitioner has failed to exhaust his State remedies.

As indicated above, petitioner was called to testify on May 21, 1976 before the Kings County Special Grand Jury and on his own request he was granted immunity and thereafter was questioned about a conversation in which he participated in New Jersey.  Petitioner now argues that truthful responses to these questions could have subjected him to prosecution in New Jersey in violation of his privilege against self-incrimination "since New York State had no authority to grant immunity from prosecution under New Jersey laws  .  .  .  (Petition at 3).

There is no longer any dispute that even though he had been granted immunity, petitioner repeatedly lied before the grand jury.  This was impermissible.  As was held in *United States v. Mandujano*, 425 U.S. 564, 576–77, 96 S.Ct. 1768, 1776, 48 L.Ed.2d 212 (1976).

"Immunity is the Government's ultimate tool for securing testimony that otherwise would be protected; unless immunity is conferred, however, testimony may be suppressed, along with its fruits, if it is compelled over an appropriate claim of privilege.  *United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510, 514 (1966).  On the other hand, when granted immunity, a witness once again owes the obligation imposed upon all citizens—the duty to give testimony—since immunity substitutes for the privilege.

"In this constitutional process of securing a witness' testimony, perjury simply has no place whatever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative."

In that case the Supreme Court relied on its prior decision in *Bryson v. United States*, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969), wherein that court said (396 U.S. at 72, 90 S.Ct. at 360, 24 L.Ed.2d 264):

"[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them."

In other words, if petitioner believed that the immunity given to him by the prosecutor was insufficient, he should have either refused to answer the questions put to him on that ground and/or sought clarification with respect to the scope of the immunity of the court supervising the grand jury.

If petitioner had taken either of such steps the supervising court might well have advised him, as the Court of Appeals for the First Circuit held in *In re Bianchi*, 542 F.2d 98, 101 (1st Cir. 1976), that:

"The requirement that every sovereign, state or federal, recognize immunity granted by another sovereign, *Murphy v. Waterfront Commission*, 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), protects appellant from the use of his grand jury testimony in any state prosecution."

and/or required the prosecutor to obtain an agreement of use immunity from the appropriate authorities in New Jersey.

While in this Court's opinion the latter would have been preferable in light of the arguably more limited holding by the Supreme Court in *Murphy v. Waterfront Commission*, 378 U.S. 64, 84 S.Ct. 1594 (1964), the existence of such latter alternative is sufficient to defeat petitioner's claim herein.

Petitioner's second ground is that he was illegally denied his right to leave the grand jury room to consult with his attorney. The record shows, however, that petitioner did not make his request to see his lawyer until he already had uttered 54 of the 55 statements which the three count indictment brought against him assigned as perjurious. And the reason that petitioner did request to see his lawyer made shortly before the 55th perjurious statement, appears to have been that the grand jury session had lasted too long and the hour was getting late. He did not object to any of the *questions* asked of him. Moments afterward he agreed with the prosecutor to continue testifying until 4pm. Furthermore, the 55th perjurious statement which petitioner made after requesting to see his attorney, appears to have been cumulative of other statements assigned as perjurious in the second count of the indictment.

Finally, petitioner argues that the prosecutor improperly tricked him into committing perjury in violation of his rights to due process. As the Court of Appeals held, there is no question but that the grand jury was conducting a valid investigation and that petitioner's testimony was relevant to that investigation. The prosecutor warned petitioner at the outset that he had evidence which indicated petitioner's involvement in kickback deals with nursing home customers and that he could be prosecuted for perjury if he lied. Moreover, the prosecutor framed his questions with the very same words which petitioner and Feinberg had used during their conversation which had been taped during the course of the investigation. Thus there is no substance to petitioner's claim on this ground.

For the foregoing reasons petitioner's application for a writ of habeas corpus must be, and the same hereby is, denied.

SO ORDERED.