THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v HELMUT STEINER, Respondent.

First Department, October 7, 1980

## APPEARANCES OF COUNSEL

*Arthur Weinstein* of counsel *(Charles J. Hynes,* attorney), for appellant.

*Jack S. Hoffinger* of counsel *(Robert A. Goldschlag* and *Stephen L. Weiner* with him on the brief; *Hoffinger, Friedland & Roth,* attorneys), for respondent.

**OPINION OF THE COURT**

FEIN, J.

The People appeal from the dismissal of an indictment accusing the defendant of three counts of perjury in the first degree. The dismissal was grounded upon a finding that "the evidence is insufficient in law to find guilt beyond a reasonable doubt". This determination was based upon a conclusion that "a fair analysis of the entire testimony is consonant with fallibility of memory, not with deliberate falsification." Trial Term also concluded, "as a matter of law it was unfair not to probe this man's mind and give him the benefit of an attempt to refresh his recollection." The court also expressed "serious doubts as to whether there was corroboration as to the third count".

There should be a reversal.

The Florence Nightingale Nursing Home in Manhattan, owned by Charles E. Sigety, is the largest in the State. From May, 1971 to March, 1975 defendant was its food service director, in charge of purchasing all food items. In this capacity he was in a position to select the food service suppliers.

Defendant was called before a New York County Grand Jury in December, 1978 as part of the investigation by Special Prosecutor Charles J. Hynes into allegations of criminal activity in the nursing home industry. This portion of the investigation focused on illegal kickbacks, rebates and cash payments from vendors and suppliers to nursing home owners and employees, all contributing to Medicaid fraud.

Defendant, who obtained immunity through his Grand Jury testimony, testified at some length concerning fiscal abuses and illegal activity by Sigety, the owner of the nursing home and the principal target of the investigation. In such testimony defendant implicated himself as well as Sigety.

With respect to his own activity, defendant initially testified that he recalled the names of a number of suppliers, despite the passage of time, but denied personal knowledge of "any form of kickback, or cash rebate or refund of any kind to any nursing home employees", noting that he had personally rejected offers of bribes and kickbacks. He conceded, however, that kickbacks had been common between the home and its suppliers when he was hired. He admitted that he was offered bribes and kickbacks, but claimed he rejected them. Defendant told the Grand Jury that one supplier would give him an

envelope full of cash each month, which defendant would deliver unopened to the accounting office. This payment, according to defendant, was not a kickback, but rather was a "standing discount" of 3-5% given to the nursing home.

Defendant testified that four vendors, named by him, had offered bribes or kickbacks, which he rejected. Aside from these four, defendant denied conversations with any other vendors as to kickbacks, cash rebates or refunds, and denied receipt of any such payment.

Among the suppliers defendant recalled as having done business with the nursing home were Lakowitz and Wexler. These men testified some months prior to defendant. Irving Lakowitz, a salesman for Triad Supply Corporation, told the Grand Jury that defendant had insisted on a cash kickback of 5% per month ("the going rate") if Triad wanted the nursing home's business. After some negotiation, Lakowitz paid defendant $25 per month in 1973, raised to $30 or $35 in 1974, plus $250 at Christmas. Lakowitz further testified about a phony bill he prepared at defendant's behest for $1,492 in merchandise that was paid for by the nursing home but never delivered. According to Lakowitz, defendant signed a receipt for this phantom delivery in exchange for which he received an envelope with $500 in cash obtained from Triad's president, Sam Weinstein. Weinstein confirmed Lakowitz' version of the false invoice deal in exchange for a $500 payoff, although he testified he never met or spoke with defendant in connection with this transaction.

Seymour Wexler, owner of Disco Wholesale Meats, Inc., testified that his company had a standing arrangement to pay defendant (and his predecessor) 5% of the monthly gross of sales to the nursing home, amounting to nearly $10,000 in cash payments over the 4-year relationship. Wexler conceded that the money for these payoffs came from padding the price or short-weighting deliveries.

The Grand Jury returned a three-count indictment for perjury in the first degree. The first count concerned defendant's denial of request for or receipt of kickbacks, cash rebates or refunds from vendors. The second concerned his denial of any conversations with vendors about 5% kickbacks, cash refunds or rebates. The third involved his denial of discussions about a fictitious invoice for goods never delivered.

In March 1980, nearly seven months after rejecting an earlier motion to dismiss the indictment, Trial Term reversed

itself and granted a subsequent motion for dismissal. After noting that most of defendant's testimony concerned the improprieties of his employer, Sigety, Trial Term based its dismissal primarily on the fact that the questions were too "general" to support a perjury indictment. In other words, in denying receipt of kickbacks in general, defendant was never specifically asked about possibly having received kickbacks from Lakowitz of Triad or Wexler of Disco. Defendant acknowledged a vague recollection of Lakowitz, when asked with whom he had dealt at Triad, but he was never specifically asked if he had ever demanded and/or received a $500 payoff from him on a fictitious invoice. Defendant's memory in response to these "general" questions could not as a matter of law, according to Trial Term, support an indictment for "purposeful perjury". Trial Term concluded that "a fair analysis of the entire testimony is consonant with fallibility of memory, not with deliberate falsification." As noted, the indictment was dismissed on a finding that "the evidence [was] insufficient in law to find guilt beyond a reasonable doubt". The implication is that defendant was trapped into the perjury indictment.

■ Trial Term erred in applying the "reasonable doubt" standard to the indictment. That is more properly the test for *conviction* of an offense (CPL 70.20). CPL 190.65 (subd 1) delineates the standard for a Grand Jury indictment: "Subject to the rules prescribing the kinds of offenses which may be charged in an indictment, a grand jury may indict a person for an offense when (a) the evidence before it is legally sufficient to establish that such person committed such offense and (b) competent and admissible evidence before it provides reasonable cause to believe that such person committed such offense."

"In the context of the Grand Jury procedure, legally sufficient means prima facie, not proof beyond a reasonable doubt" *(People v Mayo,* 36 NY2d 1002, 1004).

Plainly a prima facie case was established here.

Defendant contends that "legal sufficiency" before the Grand Jury does not dispense with the element of corroboration (CPL 70.10, subd 1), which requires something more than the testimony of a single witness in a case of perjury (Penal Law, § 210.50). Trial Term found the third count of the indictment lacking in this respect. That count involved defen-

dant's denial of discussions concerning a fictitious invoice for goods never received.

Weinstein's testimony concerning the use of a false invoice in return for a $500 payoff would appear to be sufficient to meet the test of corroborating Lakowitz' testimony. Even if hearsay, such evidence is admissible before a Grand Jury in attempting to show reasonable cause to believe that a person has committed an offense (CPL 70.10, subd 2).

■ Defendant further contends, in an argument not adopted by Trial Term, that corroboration is lacking in that the testimony of Lakowitz, Weinstein and Wexler as to the specific events, subject of their testimony, was not sufficient to meet the test in a perjury case that the falsity of a statement may not be established by the uncorroborated testimony of a single witness (Penal Law, § 210.50). We hold there is no need for such specific corroboration. The three counts of the indictment were premised upon defendant's denial of requests for, or receipt of, kickbacks, cash rebates or refunds, denial of conversations with vendors about 5% kickbacks, cash refunds or rebates, and denial of discussions about a fictitious invoice. The testimony of Lakowitz and Wexler concerning disparate events, and the testimony of Weinstein corroborating Lakowitz, corroborate each other to the extent that they demonstrate there were such conversations and transactions. Defendant's testimony was that he had *no* such discussions or transactions. The witnesses' testimony as to the particular conversations and transactions constitutes independent proof of the false statements of defendant *(People v Skibinski,* 55 AD2d 48; *People v Calcante,* 97 Misc 2d 593; cf. *People v Sabella,* 35 NY2d 158, 167 *et seq.).*

■ Trial Term's intimation that defendant was trapped into perjuring himself is more troublesome. Forty of the 153 pages of defendant's testimony were devoted to defendant's òwn activities as food service director. The prosecutor knew that Wexler, Lakowitz and Weinstein had testified that there were discussions about and transactions with defendant involving kickbacks, refunds, rebates and phony bills and that substantial sums of money had been paid to the defendant over an extended period of time. Unaccountably, the prosecutor failed to press or further question defendant with respect to these specific events. No reason appears as to why the prosecutor did not do so. He should have pursued the subject matter with further inquiry. However, we disagree with Trial Term that

"as a matter of law it was unfair not to probe this man's mind and give him the benefit of an attempt to refresh his recollection." Although it would have been the better practice to probe further, it cannot be said that the failure of the prosecutor so to question the defendant was an attempt to lead him into the box canyon of entrapment (cf. *People v Davis,* 74 AD2d 801). The prosecutor should confront the witness with the substance of the contradictory information known to the prosecution in an effort to determine the truth and advance the substantive purpose of investigation. However, although the duty of the Special Prosecutor is to provide "ample cues to stimulate defendant's recollection" *(People v Pomerantz,* 46 NY2d 240, 249), where the events are "memorable" and the testimony relates to significant events over an extended period of time it cannot be concluded that the failure further to probe the memory of the witness vitiates the indictment. This was not a case where the inquiry related to "peripheral" details or consisted in "an unmitigated effort to trap the witness on minor outward details of a single meeting" *(People v Tyler,* 46 NY2d 251, 259-260). The inquiry here related to matters of substance with which the People were rightfully concerned. The issue was whether defendant demanded and received over $10,000 in kickbacks in regular monthly payments over a period of several years. This was a "memorable" event *(People v Pomerantz, supra,* at pp 248-249), even though it had occurred some years before the testimony. It is immaterial that the main focus of the investigation was Sigety. Defendant's substantial participation in a kickback scheme as extensive as that testified to by the witnesses before the Grand Jury was properly a matter of legitimate concern to the Grand Jury. The information sought might implicate Sigety and others in the scheme. It is plain that the purpose was not to trap the defendant into committing perjury. There were substantive investigative goals.

It is notable that defendant's memory was clear on some aspects of his duties and activities at the nursing home and surprisingly vague on questions relating to kickback schemes that would have netted him a considerable amount of money during his tenure there. It is difficult to accept the notion that his failure to recall and testify as to these matters was a mere matter of "fallibility of memory". The evidence before the Grand Jury was sufficient to make a prima facie case.

Trial Term's dismissal for insufficiency based on the fallibil-

ity of defendant's memory was an improper invasion of the province of the Grand Jury *(People v Dunleavy,* 41 AD2d 717, affd 33 NY2d 573).

Although we are reversing the dismissal of this indictment, we believe it appropriate to invite the prosecutor's attention to the principle stated in *Pomerantz (supra)* that it is the duty of the prosecutor to provide cues to stimulate a defendant's recollection. This is plainly the teaching of *People v Schenkman* (46 NY2d 232); *People v Pomerantz (supra);* and *People v Tyler (supra).* It should be followed. A "sophisticated facade to trap the defendant into a new crime of perjury or contempt, and not to establish evidence of antecedent crime" will not be countenanced *(People v Pomerantz, supra,* at p 250).

The order, Supreme Court, New York County (MELIA, J.), entered March 3, 1980 dismissing the indictment accusing defendant of three counts of perjury in the first degree, is reversed on the law, and the indictment is reinstated.

SANDLER, SULLIVAN, BLOOM and CARRO, JJ., concur.

Order, Supreme Court, New York County, entered on March 3, 1980, reversed on the law, and the indictment reinstated.