■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LOU V. TEMPERA, Appellant. — Appeal by defendant from a judgment of the County Court, Suffolk County (Seidell, J.), rendered May 21, 1982, convicting him of five

counts of perjury in the first degree, upon a jury verdict, and imposing sentence. Judgment affirmed, and matter remitted to the County Court, Suffolk County, for further proceedings pursuant to CPL 460.50 (subd 5). Defendant stands convicted of five counts of perjury in the first degree for giving false testimony during a Grand Jury investigation into allegations that he, in his capacity as Commissioner of the Suffolk County Department of Labor, accepted cash kickbacks for awarding contracts funded by the Federal Comprehensive Employment and Training Act. The evidence adduced at trial overwhelmingly establishes that defendant testified falsely under oath with respect to matters material to the Grand Jury investigation. In a multifaceted approach, defendant raises several arguments for reversal, a few of which merit discussion. Initially, we reject defendant's claim that the indictment is a product of a perjury trap set by the prosecutor, a practice condemned in *People v Tyler* (46 NY2d 251). Whether defendant was the victim of a perjury trap generally is a question of fact to be submitted to the triers of fact for appropriate resolution (*People v Tyler, supra*, p 259; *Matter of Nigrone v Murtagh*, 36 NY2d 421, 426; *People v Davis*, 53 NY2d 164, 174; *People v Fischer*, 53 NY2d 178, 183, n 1). No such issue was submitted to the jury in this case and on the record before us it cannot be said as a matter of law that defendant was led into a trap requiring dismissal of the indictment. On the contrary, the prosecutor's questioning of the witness was designed to ascertain facts material to the Grand Jury investigation of improper payments of money to defendant, which transactions might have amounted to the commission of a crime by the payers and not, as defendant posits, to secure a perjury indictment. As a further issue, defendant argues that prosecutorial misconduct with respect to a tape recording warrants reversal. Prior to trial and pursuant to the dictates of *Brady v Maryland* (373 US 83), the prosecutor delivered to defense counsel a tape recording of a conversation between defendant and a man who identified himself as Stuart Goldberg. This individual requested defendant's help to prevent his incarceration because defendant's accomplice in the scheme to receive kickbacks in exchange for awarding municipal contracts to the payers was going to testify against him. Defendant did not make any incriminating statements, but merely disclaimed any knowledge with respect to the subject matter of the conversation. Although the tape was labeled, "10/14/80 INV Drielak, case #53-80, Tempera", the prosecutor never expressly informed defense counsel that the voice on the tape belonged to an undercover officer named Drielak, posing as Stuart Goldberg, until after defense counsel had delivered his opening statement to the jury, informing the jury that a tape recording of a conversation between defendant and Stuart Goldberg would be played as part of the defense. Prior to playing the tape, the trial court, in accordance with defense counsel's request, instructed the jury that on the prior day, for the first time, defense counsel learned that the person on the tape was not Stuart Goldberg but an investigator for the District Attorney's office. The undercover investigator was called as a defense witness and testified on cross-examination that he thought defendant suspected that he was not Stuart Goldberg and, therefore, defendant had tailored his responses accordingly. Defendant argues that the prosecutor's untimely disclosure that the voice on the tape belonged to a special investigator and not Stuart Goldberg irreparably undermined the preparation of his defense and, thus, deprived him of a fair trial and effective assistance of counsel. Conceivably, if defendant had never realized that he was talking to an undercover officer, his denials of any involvement had some credence; whereas, if defendant knew he was talking to an undercover investigator, his denials had no credence. Under the circumstances, the prosecutor had an obligation to disclose the true identity of the

voice on the tape, since, during the preparation for trial, the tape on its face could have served to create a false impression in defense counsel's mind as to its exculpatory impact. However, in light of the trial court's curative instruction to the jury, which served to bolster the tape's exculpatory impact, any prejudice which may have accrued to defendant was effectively ameliorated. Defendant next contends that he was denied a fair trial because there was improper cross-examination of his character witness. It is well established that character witnesses may be asked as to the existence of rumors or reports of particular acts allegedly committed by the defendant which are inconsistent with the reputation they have attributed to him, provided there is a good-faith basis for the inquiry (*Michelson v United States,* 335 US 469; *People v Kuss,* 32 NY2d 436, 443; Richardson, Evidence [Prince 10th ed], § 153). Contrary to defendant's assertion, during the trial court's preliminary review of the proposed questions to be asked on cross-examination, the prosecutor demonstrated his good faith by revealing a reasonable basis in fact for said questions. Accordingly, the trial court did not abuse its discretion in permitting the inquiry. In order to establish that defendant testified falsely as to the receipt of illegal kickbacks, proof that his expenditures and acquisition of municipal bonds were inconsistent with his reported income was admitted into evidence. Defendant claims this evidence was inadmissible because the prosecutor failed to establish defendant's net worth at the commencement of the period at issue, drawing an analogy between the instant case and a category of cases known as the "net worth tax fraud" cases (see *Holland v United States,* 348 US 121; *Capone v United States,* 51 F2d 609; *Taglianetti v United States,* 398 F2d 558, affd 394 US 316). Proof that a defendant is living far above the means provided by his disclosed income is of great probative value to establish receipt of ill-gotten gains in a case involving the commission of a crime for the alleged motive of financial gain. Unlike cases involving prosecutions for tax evasion (see *Holland v United States, supra,* pp 126-127), the establishment of a defendant's opening net worth is not necessary to permit admission of such evidence. Lack of proof of a defendant's opening net worth is a matter of weight and not a matter of admissibility (see *United States v Falley,* 489 F2d 33, 39; accord, *United States v Goldenstein,* 456 F2d 1006; *United States v Mirenda,* 443 F2d 1351, cert den *sub nom. Verdugo-Medina v United States,* 404 US 966; *People v Connolly,* 253 NY 330). The distinction between the treatment of the general net worth tax fraud cases and cases where only a crime of financial gain is involved, results from the fact that in the former, the Government generally relies for its conviction exclusively on the inference to be drawn from the financial evidence. In the typical case where a crime of financial gain is involved, such as the one at bar, evidence that defendant's expenditures far exceeded his legitimate income merely serves to corroborate other direct evidence that defendant engaged in the substantive crime and cannot, standing alone, establish a *prima facie* case. Although the same difficulty of refutation is inherent in both types of cases, there is no danger in this case that a failure in refutation would be completely conclusive on the merits (see *United States v Falley,* 489 F2d 33, 40, *supra*). Consequently, proof of an opening net worth was not required, and admission of proof of defendant's expenses and acquisitions in excess of his reported means was proper. Defendant next contends that the court's failure to instruct the jury on the proper use of notes that were taken during readings of portions of the trial testimony after the jury commenced deliberations constitutes reversible error. No notes were taken during the direct and cross-examination of the trial witnesses. After the close of the first day of deliberations, the jury asked that the indictment be read to it and defendant consented to the taking of notes during

the reading. Although the jury continued to take notes during requested readings of the trial testimony, defendant never affirmatively objected to this practice, nor was the court requested to give cautionary instructions. In view of these facts, any error of law has not been preserved for appellate review (see *People v Cona*, 49 NY2d 26) and we decline to exercise our discretionary power to review the issue in the interest of justice (cf. *People v Di Luca*, 85 AD2d 439). Another claim of error raised by defendant is that the supplemental charge to the jury after a report of a deadlock was unbalanced and coercive. Any instruction to the jury given in an attempt to reconcile their views must be addressed to all the jurors and not to the minority, assuming there is a minority (see *People v Robinson*, 84 AD2d 732). The trial court gave no instruction to the majority to reconcile their views with the minority. The instruction to reconcile was addressed only to the minority. At the conclusion of the supplemental charge the court did caution the jurors not to construe its instructions as an "indication that you should relinquish your honest convictions". Although there was an imbalance in the court's supplemental charge, it cannot be said to have coerced a verdict as evidenced by the fact that the jury, after receiving the charge and prior to reaching a verdict, continued to deliberate over the course of the next two days. Titone, J. P., Weinstein, Bracken and Boyers, JJ., concur.