*166 OPINION OF THE COURT
Chief Judge Cooke.
Presented on this appeal is the question whether a perjury indictment should have been dismissed under People v Tyler (46 NY2d 251) as the product of a perjury trap set by the prosecutor. The courts below held in the affirmative. We now reverse, concluding that dismissal of the indictment is unwarranted on the present record.
Defendant was indicted for perjury in the first degree for giving false testimony during a Grand Jury investigation of bribery and official misconduct. Defendant, then a detective in the Seventh Homicide Division and a 19-year veteran of the New York City Police Department, was not a target of the Grand Jury investigation, which was directed at certain organized crime figures, and was granted immunity with respect to his testimony. Specifically, the Grand Jury sought to determine whether the actual target of the investigation or his agents bribed defendant to identify an undercover officer. The Grand Jury investigation was prompted by defendant’s action on the night of December 2, 1977.
The Grand Jury was informed that as part of an investigation of organized crime activity conducted by the New York County District Attorney, Detective Salvatore Rizzo frequented the Posh Place, a bar located on the corner of East 19th Street and Second Avenue in Manhattan. On the night of December 2, Rizzo was at the bar and officially on duty. He observed that two men, one of whom was later identified as defendant, were looking at him. Rizzo left the bar, but noticed one of the men who had been watching him standing in the middle of the block. As he attempted to return to the bar, he saw defendant leaving. As Rizzo tried to enter a nearby building, one of the men asked if they could talk to him. Defendant displayed a police badge but the numbers were not visible. In response to defendant’s request, Rizzo produced identification for his assumed identity. Defendant informed Rizzo that they were from the Bronx Homicide Division investigating a case and asked what kind of car Rizzo was driving. When Rizzo described it, defendant stated that it was the type of car that had hit *167 another person. Rizzo offered to show him the car but defendant declined. Sometime during the conversation, one of the men produced a photograph, a mug shot, and said that Rizzo resembled the man in the photograph. Rizzo denied the likeness. The brief confrontation ended, and defendant and the other man went to a car. Rizzo had never revealed his status as a police officer. As Rizzo left the scene, he noted the license plate. He later discovered that the car was registered to defendant. Following this incident, Rizzo thought he was being watched more closely at the Posh Place and abandoned his undercover activities there.
Within a few days, defendant was questioned about the incident by his superiors, Lieutenant John A. Gulley and Sergeant Vernon Geberth. Defendant informed them that he had been in the vicinity of the Posh Place on December 2 at the request of his friend, Jerry Vassilatos, to help a man named “Louie” locate and collect money from the person who damaged a car for which Louie was responsible. To his superiors, defendant categorically denied ever having left his car.
Defendant was questioned extensively before the Grand Jury. During his testimony, defendant denied personally knowing the target of the investigation and denied that he had been paid or otherwise influenced to identify an undercover officer. He explained his presence at the Posh Place, as he had to his superiors, as a favor to his friend Vassilatos. Defendant then explained to the Grand Jury that he had stopped Rizzo because he thought Rizzo might have been one Armando Colon, a fugitive wanted in The Bronx for numerous homicides. Defendant ultimately had allowed Rizzo to leave because he was sufficiently convinced that Rizzo was not Colon.
Following this explanation of his encounter with Rizzo, defendant was asked whether, as required by the department, he had filed a report of the stop. Defendant admitted that he had not. There was further questioning about the details of the encounter. Defendant was then asked whether he knew the target of the investigation or that the Posh Place was an establishment known to be frequented by the target and others involved in criminal activity. Defendant *168 answered in the negative. He then admitted that he suspected the latter following the discussion with his superiors.
Defendant was asked to describe the meeting. Defendant then related that Gulley first questioned him alone about his presence at the Posh Place. Defendant told Gulley about “Louie” and that Louie thought the man he was looking for owned, worked in or patronized the Posh Place. Gulley told defendant that a big investigation was involved. The conversation ended and a second meeting occurred about 20 minutes later. Sergeant Geberth joined defendant and Gulley at this point.
In response to the prosecutor’s question about “what occurred”, defendant thereafter testified:
“A. Was approximately fifteen or twenty minutes after the first meeting. Lieutenant Gulley mentioned the name Joe Tortorella, he said, 'This Posh Place is owned by Joe does that name ring anything to you’, I says, 'Only that it’s possibly an organized crime person’, he says, 'Well’, he says, ‘I’m telling you this is a heavy investigation, Jim,’ he says, 'What were you doing there’ and I explained it to him again. He inquired if I had spoken to anyone and I said, 'No, I didn’t speak to anyone’ and then he went into a — other conversation and he said, 'Well, we have witnesses that a guy your size’ and I'm six seven and weigh 275 pounds so too there is not many people my size, 'Was on 19th Street and kicking the s — out of somebody’. So, I says, T never got out of the car. I never got out of the car’.
“prosecutor:
“Q. Did you just tell us, tell the grand jury that during this conservation with the Lieutenant and the sergeant you were told by the Lieutenant that there was an allegation that somebody fitting your description had been assaulting somebody?
“A. Seen in the area, yes, sir.
“Q. No, no.
“A. Oh.
“Q. I didn’t say that, please, Detective. Didn’t you just tell us that you were told during this meeting with the *169 Lieutenant and the sergeant by the Lieutenant that someone fitting your description was seen in the area assaulting somebody?
“Yes, sir.
“Q. Go ahead?
“prosecutor:
“Q. Okay. What else occurred?
“A. So, he says, ‘Did you make a phone —’ I said, ‘No, I never made a phone call’, ‘Well, who was with you’ and I told him ‘Jerry and this fellow Louie’ and he says, ‘Well, who else — is Louie’ I says, ‘Jerry introduced me but I didn’t get his last name’. So, he says, ‘Well, when did you — are you sure you didn’t get out of the car’, I says, ‘No, I never —didn’t get out of the car. When Louie — Louie arrived we sat on the car, sat in the car on 2nd Avenue for approximately 45 minutes to an hour and I never got out of the car’. So, he says, ‘Well, Jim’, he says, ‘You know, you better —better, you know, make sure’, he says, ‘Because this is a heavy one. This is — this is — they’re talking about organized crime’, he says, ‘You know the names that I read to you’, I says — said, ‘Well, I heard them in the newspapers I don’t —other than that I didn’t bother with the department it’s not my field. So, I have nothing — I don’t usually — the only time I involve — involved with organized crime when I read it in the papers’.”
Defendant could not recall whether anything else was discussed at the meeting. The prosecutor reviewed defendant’s testimony concerning what he had said to and denied to his superiors. The prosecutor then pointed out that defendant had lied about the incident and concealed material information, i.e., that he had taken police action on the night in question. Defendant responded that his conduct with his superiors was difficult to explain but offered that it was prompted by the absence of constitutional warnings, which he would have expected if there was an allegation of criminal activity.
Defendant was excused and returned on the following day. Defendant was questioned again about his activities on December 2 and the details of his encounter with Rizzo. *170 Defendant was shown photographs of organized crime figures and was asked if he knew or had seen them. Defendant replied in the negative. There was brief questioning about defendant’s meeting with his superiors and about whether defendant had discussed the Grand Jury investigation with Vassilatos. Defendant was again asked whether the target or any agent of the target requested defendant to identify an undercover officer. Defendant answered in the negative. He was also asked about his relationship with Vassilatos, a former police officer who had been convicted of extortion. Although acknowledging that Vassilatos offered him a job after retirement, defendant denied that the stop of Rizzo was related to that or any other payment.
Thereafter, Gulley and Geberth appeared before the Grand Jury and related the contents of the conversations with defendant. Gulley and Geberth related that defendant was asked whether he was at the Posh Place or stopped anyone. Both denied that either had told defendant that a person fitting his description was seen on 19th Street kicking someone.
Defendant thereafter was indicted for perjury in that he falsely attributed to Lieutenant Gulley the statement concerning an assault. His pretrial motion to dismiss the indictment was granted by Supreme Court on numerous grounds. The Appellate Division affirmed on the authority of People v Tyler (46 NY2d 251, supra), three Justices concluding that the indictment was the result of a perjury trap and two Justices concluding that the prosecutor was obligated to question defendant further about the statement and confront him with the contrary version of the meeting. The People were granted leave to appeal to this court. There should be a reversal.
To be disposed of first is the argument that the false statement for which defendant was indicted was not material to the Grand Jury investigation and thus could not form the basis of a first degree prejury charge, an essential element of which is materiality (Penal Law, § 210.15). In this State, materiality is a question of fact for the jury (People v Clemente, 285 App Div 258, affd no opn 309 NY 890; see People v Ianniello, 36 NY2d 137,144). To be mate *171 rial, the statement need not prove directly the fact in issue; it is sufficient if it is “circumstantially material or tends to support and give credit to the witness in respect to the main fact” (Wood v People, 59 NY 117,123). Thus a statement that “reflect [s] on the matter under consideration” (People v Stanard, 42 NY2d 74, 80), even if only as to the witness’ credibility (see People v Samuels, 284 NY 410, 414; People v Courtney, 94 NY 490), is material for purposes of supporting a perjury charge. Put another way, the test of materiality may be said to be “whether the false testimony has the natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation” (United States v Stone, 429 F2d 138, 140; United States v Carson, 464 F2d 424, cert den 409 US 949). Under any formulation of the test, the materiality of defendant’s statement is manifest.
The purpose of the Grand Jury investigation was to discover why defendant had stopped Detective Rizzo. The prosecutor’s theory was that organized crime figures then under investigation had bribed defendant to reveal the identity of the undercover officer. Defendant’s explanation to the Grand Jury was to the contrary and belied an improper motive for the stop: he was at the Posh Place to help the friend of a friend collect a sum of money and thereafter took police action when he observed a man who resembled a suspect wanted for numerous homicides. The validity of this explanation was seriously undermined, however, by defendant’s false statement to his superiors and his failure to inform them of the police action. The circumstances surrounding defendant’s discussions with his superiors thus were critical for the Grand Jury’s evaluation of his testimony. Confronted with his prior falsehood, defendant acknowledged that he had lied but explained that he thought he was being charged with an assault. This explanation substantially mitigated the damage to his version of the stop as properly motivated police action. Defendant’s response did not simply bolster his credibility generally, it gave substantive aid to his denial of improper motive. Put simply, defendant’s conduct was the very matter being investigated by the Grand Jury. His explanation of his activities to his superiors, the fact that the explanation was a lie *172 and the reason for the lie, had direct bearing on whether defendant’s conduct involved criminality. In such circumstances, there is at least a fact question for the jury concerning materiality.
We turn then to defendant’s main argument in support of dismissal, accepted below, that the indictment represents the prosecutor’s successful effort to “trap” defendant into perjury, a practice condemned in People v Tyler (46 NY2d 251, supra). Tyler does not compel dismissal of the indictment here.
In Tyler, this court dismissed an indictment for perjury committed during a Grand Jury investigation of bribery, bribe receiving and official misconduct. The court concluded that the questioning of the witness, a Supreme Court Justice, was designed not to ascertain facts pertinent to the Grand Jury investigation but to secure a perjury indictment.. The false answers for which the defendant was indicted were in response to questions concerning simply “outward details of place and time” of a meeting between the defendant and an organized crime figure (46 NY2d, at p 254). Although the substance of that meeting was the goal of the Grand Jury investigation, the prosecutor made little attempt to obtain information relative to that meeting. Instead, armed with a complete description of the defendant’s movements from members of a surveillance team, the prosecutor questioned the defendant on “peripheral details” of the meeting without giving the witness even limited cues to refresh what might have been simply faulty recollection (id.). Through the manner and subject of the questioning, the prosecutor “demonstrated no palpable interest in eliciting facts material to the authorized substantive investigation of antecedent crime or official misconduct” (id.). The totality of these circumstances led the court to conclude that the interrogation as a matter of law was merely a “perjury trap”.
Tyler stands for no more than that a perjury indictment requires a demonstration of intentional falsity in response to “purposeful substantive inquiry” (46 NY2d, at p 262) —that such an indictment may not be predicated upon interrogation techniques that have perjury as the sole object. *173 On this record, it must be said as a matter of law that the questioning here does not amount to the practice condemned in Tyler. Indeed, none of the circumstances found compelling in Tyler are present.
As noted earlier, the Grand Jury sought to determine why defendant had stopped Detective Rizzo for identification on December 2. His response to the inquiry was that he was pursuing proper police action. The fact that he had lied when questioned by his superiors and his reason therefor were of critical significance. Without prompting, defendant offered that he had been accused or suspected of an assault. It is true that the prosecutor immediately reiterated defendant’s answer for confirmation. But nothing in the exchange demonstrates that the questioning was designed as a perjury trap. Indeed, the question precipitating the revelation was simply a request for a description of what occurred at defendant’s meeting with his superiors.
To characterize the prosecutor as being preoccupied with trapping defendant simply reads too much into the record at this point. As far as the record reveals, the prosecutor genuinely may have been surprised by defendant’s statement, offered in mitigation of his previous lie. No improper motive can be attributed to the prosecutor as a matter of law simply because he promptly repeated the response, seeking confirmation. Nor can such a motive be found because he did not question defendant further about that particular statement. Defendant was questioned extensively about the contents of the conversation. Answers were routinely repeated by the prosecutor. And, when confronted directly with the fact that he had lied to his superiors about purportedly proper police action, defendant explained that he had not been advised of his constitutional rights, a response consistent with the earlier false statement.
Also significant here is the fact that the subject of the particular line of questioning was a memorable event. And, it was the substance of the meeting to which the inquiry was directed, not merely outward details of its occurrence. Defendant evidenced little inability to recall. In such circumstances, intentional rather than inadvertent falsifying is reasonably demonstrated by the record (cf. People v *174 Pomerantz, 46 NY2d 240; People v Schenkman, 46 NY2d 232).
The absence of further questioning about the false statement does not, as urged, detract from that view. A prosecutor is not obligated in every case to probe a particular response. The prosecutor here was not faced with an apparent inability to recall, such as would prompt him to press further on the subject. He was confronted with an unequivocal statement. There is nothing in the record that shows that the prosecutor knew that the statement just made was not true; Gulley and Geberth had not yet testified before the Grand Jury. There simply is nothing that would or should have alerted the prosecutor to the possibility that defendant’s statement was mistakenly or inadvertently false.
Also unpersuasive here is the suggestion that a perjury trap is shown because the prosecutor did not confront defendant with the contrary evidence. As noted, the record of the Grand Jury proceedings does not show that the prosecutor possessed contrary evidence or knew that defendant was lying at that point. Furthermore, there is no requirement of such confrontation in every case. Faced with a falsehood, a prosecutor is not obligated to offer the witness an opportunity to recant or tailor his testimony to conform to the available information (see People v Tyler, 46 NY2d, at p 261, supra; People v Pomerantz, 46 NY2d, at p 249, supra). The purpose of confronting a witness with contrary facts or of providing even limited cues is simply to assure that the witness’ response is a deliberate falsification (see People v Tyler, 46 NY2d, at pp 261, 262, supra). Such assurance may be unnecessary, however, where there are other indicia that the response is knowingly false. Sufficient assurance is present here.*
As was made clear in Tyler, whether a perjury indictment represents a trap set by the prosecutor generally is a question of fact (46 NY2d, supra, at pp 259,262; see People *175 v Fischer, 53 NY2d 178, 183, n 1, [decided herewith]). On this record, it must be said as a matter of law that defendant was not led into a perjury trap requiring dismissal of the indictment.
Finally, the legal instructions to the Grand Jury concerning the elements of perjury in the first degree were sufficient (see People v Calbud, Inc., 49 NY2d 389).
Accordingly, the order of the Appellate Division should be reversed, the indictment reinstated and case remitted for further proceedings on the indictment.

 We decline to adopt a rule that a perjury trap is to be found in every case in which the prosecutor does not confront the witness with his or her falsehood, without regard to the circumstances. To do so would unnecessarily restrict the Grand Jury investigatory process.