THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ROBERT D'ALVIA, Appellant.

Second Department, September 30, 1991

## APPEARANCES OF COUNSEL

*Morosco & Cunard (B. Anthony Morosco* of counsel), for appellant.

*Carl A. Vergari, District Attorney (John J. Sergi* and *Richard E. Weill* of counsel), for respondent.

## OPINION OF THE COURT

THOMPSON, J. P.

■ The defendant was convicted, following a jury trial, of one count of perjury in the first degree (Penal Law § 210.15) and three counts of criminal contempt in the first degree (Penal Law § 215.51). On this appeal of the conviction, we are called upon to determine whether the defendant's challenge to the trial court's error in permitting the jury to separate overnight after it had retired to deliberate in violation of the mandatory sequestration provision of CPL 310.10 was waived by the defendant's affirmative consent to the separation. We hold that the defendant waived the protection afforded by CPL 310.10 and, therefore, the error underlying the defendant's principal argument on appeal does not require the reversal of his conviction.

I

The defendant in this case, Robert D'Alvia, was an experienced criminal defense attorney and a former Assistant District Attorney in Westchester County. The charges against him have their genesis in an insurance fraud investigation commencing in 1987 in Westchester County. Dominick Lieto (hereinafter Lieto), the subject of that investigation together with his wife Carol Lieto, was eventually indicted and charged with 14 counts of insurance fraud.[1] At the request of former Westchester County Supreme Court Justice Anthony Ferraro, Lieto's father-in-law and a longtime friend of the defendant's family, the defendant agreed to represent Lieto with respect to the insurance fraud charges. The key prosecution witness in the case against Lieto was David Rizzo, Lieto's former tenant and friend, who assisted the police in their investigation and testified against Lieto at a preliminary hearing. However, Rizzo later executed a backdated affidavit recanting his testimony and absolving Lieto of any wrongdoing. Meanwhile, Rizzo informed Assistant District Attorney Benedict

---

1. Dominick Lieto was convicted after a jury trial of criminal possession of stolen property in the first degree. His appeal from his conviction was heard concurrently with the defendant's appeal and by decision and order of this same date the judgment of conviction is reversed and the indictment is dismissed *(see, People v Lieto,* — AD2d — [decided herewith]).

Palazzolo who was in charge of the Lieto case that his affidavit was procured in exchange for a promised payment of $1,000 upon execution of the affidavit and an additional payment of several thousand dollars to be made upon dismissal of the charges against Lieto. This bribery scheme involved not only Justice Ferraro, Lieto and the defendant but also Rizzo's own attorney Robert Tassio. Tassio agreed to cooperate in the bribery investigation in exchange for a grant of immunity. Toward that end, Tassio wore a hidden electronic recording device to record surreptitiously his conversations with Ferraro[2] and the defendant. Statements made by the defendant in these recorded conversations which were at variance with his Grand Jury testimony formed the basis for the perjury and contempt charges against him.

The trial of the defendant before County Court Judge George S. Kepner, an out-of-district visiting Judge, lasted approximately 2½ months. Prior to summations and the court's charge to the jury, the following colloquy took place between Judge Kepner and the attorneys out of the presence of the jury:

"THE COURT: Now, one further question that the jury raised, and you don't have to get into this now if you don't want to, but under the state of the law at the moment if the parties consent, then the jury does not have to be sequestered at night. I'm not going to do this in front of the jury obviously. What is your feeling about that?

"MR. BOLEN [Assistant District Attorney]: Would you ask the defense first?

"MR. MOROSCO [defense counsel]: We haven't discussed it, Judge. May we have a minute?

"THE COURT: Sure".

The defense counsel then conferred with his cocounsel and the defendant with respect to the court's proposition and the colloquy then continued as follows:

"MR. MOROSCO: Judge, quite frankly, I've never had this experience in being called upon to do this before.

"THE COURT: Neither have I.

"MR. MOROSCO: So it's a new and novel exercise. What would

2. Justice Ferraro was indicted by reason of his involvement in the bribery scheme and was subsequently convicted of two counts of criminal solicitation in the fourth degree. His conviction was affirmed by this court (see, People v Ferraro, 169 AD2d 732).

be your thinking in terms of the period of deliberation if we did that? Would it just be the regular court hours, or would you keep them into the evening?

"THE COURT: I have been advised that the normal practice down here is that at supper time, which could be six or six-thirty or whatever, the jury, if they're sequestered, would go out to dinner and then to the hotel. They would come back the next morning after breakfast.

"MR. MOROSCO: That's one option. Usually the practice is to send them to dinner and to the hotel. It's a recent practice. It's not what it used to be.

"THE COURT: I once had a jury in and told them we were going to dinner, and they said no, and they all went back to the jury room.

"MR. MOROSCO: My question is, if we did not sequester the jury, what would be your procedure, barring what they said, what would be your practice?

"THE COURT: If they're not sequestered, then you don't have to worry about feeding them or getting them hotel reservations at all. So conceivably, I don't know. You could either keep them until seven and send them home, or feed them and bring them back, because you won't have to worry about bringing them to the hotel. Very frankly, most places they don't bring them back, from what I heard, because of the danger around the courthouse. Upstate we always bring them back. We keep them until eleven or twelve midnight. Now, I don't know what the situation is in White Plains, of having them eat and bringing them back.

"MR. BOLEN: There's no problem.

"THE COURT: If they were not sequestered we would bring them back after dinner.

"MR. MOROSCO: Okay. We have no objection if the jury is not sequestered".

The prosecutor was then provided an opportunity to respond on the issue of whether the jury should be permitted to separate during deliberations. Relying upon the Third Department case of *People v Silvernail* (55 AD2d 72), the prosecutor stated that he had no objection to allowing the jury to separate as long as the defendant personally waived his right to sequestration of the jury. The colloquy continued:

"MR. MOROSCO: Unless you have them come back after dinner, and send them back with the Court Officer to have

dinner, and then bring them back until nine or nine-thirty, whatever was a reasonable hour.

"THE COURT: Yes.

"MR. MOROSCO: It is my understanding that was the basis upon which we indicated no objection.

"MR. BOLEN: I'm getting ahead of this, and I don't mean to say this, but would the Court, depending upon how long deliberations go on, entertain an application, assuming they have a full day of deliberations, excusing the jury at six o'clock one particular evening?

"THE COURT: He's got a problem on that.

"MR. BOLEN: Yes, that's Saturday night.

"MR. MOROSCO: If we get into Saturday, I have no objection to releasing the jurors at six o'clock Saturday evening. We ought to also consider a late convening on Sunday so the jurors can attend church, if they wish.

"THE COURT: Yes. Mr. D'Alvia [the defendant], in view of what the Assistant District Attorney said, let me ask you this: Have you discussed with Mr. Morosco and Mr. Orlando [co-counsel] this question about sequestration of the jury?

"THE DEFENDANT: Yes.

"THE COURT: Do you have any objection if the jury does go home, to sleep, whatever, in the evening, based upon the fact that they would have dinner and then return to the court-house and then go home?

"THE DEFENDANT: I have no objection, your Honor, to the way Mr. Morosco has stated it.

"THE COURT: Mr. Orlando, do you have any objection to this procedure?

"MR. ORLANDO: No, sir, based upon what you said, I have no objection".

Following this colloquy, the jury was brought into the courtroom and, in open court in the presence of the defendant and counsel, Judge Kepner informed the jury of the procedures which would be followed during their deliberations as agreed to by counsel and the defendant and that they would not be sequestered during that period.

The next day defense counsel and the prosecutor delivered their respective summations and the jury was instructed with regard to the law. After a dinner recess, the jury retired to begin deliberating at 8:43 P.M. The jury was returned to the courtroom at 10:00 P.M. in order to be dismissed for the night.

Prior to the separation, the Judge admonished the jurors not to discuss the case amongst themselves or with anyone else during the overnight recess, not to visit the scene of any occurrences which were the subject of testimony at the trial, and not to read or listen to any newspaper, radio or television accounts about this case. The court further instructed the jury of its duty to report any attempts by any person to improperly influence any member of the jury. Similar admonitions were given at virtually every luncheon recess as well as before each overnight recess during the course of trial. Given the protracted length of the trial the jury heard the cautionary instructions nearly 40 times.

The court reconvened at 9:00 A.M. the next morning and the jury resumed deliberations. During the course of the day, pursuant to requests from the jury, the court replayed certain of the tape recordings introduced at trial and reinstructed the jury as to the elements of certain counts of the indictment. At 5:20 P.M., the jury returned its verdict finding the defendant guilty of perjury in the first degree and three counts of criminal contempt in the first degree.

## II

On appeal from the conviction, the defendant argues that after submission of the case to the jury, the trial court's authorized overnight separation of the jury during deliberations constituted reversible error per se. Our analysis of this issue must necessarily begin with the statutory predicate for sequestration found in CPL 310.10, which provides that once a jury has retired to commence its deliberations it "must be continuously kept together under the supervision of a court officer or court officers".

## A.

The antecedent to CPL 310.10 is to be found under the strict rule of the common law. Under that ancient rule the jury in both civil and criminal cases was not permitted, after it was sworn, to be discharged or separated until the rendition of its verdict. Indeed, at common law, not only were jurors subject to enforced sequestration literally as "prisoners of the court" *(State v Magwood,* 290 Md 615, 616, 432 A2d 446) but during their deliberations they were deprived of the necessities of life, i.e., "meat, drink, fire or candle" *(State v Magwood, supra,* 290 Md, at 616, 432 A2d, at 446), until their verdict was

reached (see, *United Verde Copper Co. v Kovacovich,* 42 Ariz 159, 22 P2d 1085, 1086; *see generally,* Evans, Mandatory Jury Sequestration Deemed Archaic by Administrative Judge, NYLJ, Apr. 28, 1982, at 25, col 4, at 32, col 4).

The rigors of the common-law rule have been gradually disappearing and the evident trend has been toward a relaxation of the concept of jurors as prisoners of the court. On the Federal level where the question of jury sequestration is not governed by statute, the courts are generally in agreement that the decision to sequester a jury either during trial or after deliberations have begun is entrusted to the sound discretion of the trial court and its decision will not constitute reversible error absent a showing of actual prejudice arising therefrom (see, *United States v Persico,* 832 F2d 705, 718 [2d Cir 1987], *cert denied* 486 US 1022; *United States v Greer,* 806 F2d 556, 557 [5th Cir 1986]; *United States v Arciniega,* 574 F2d 931 [7th Cir 1978], *cert denied sub nom. Marquez v United States,* 437 US 908; *United States v Menna,* 451 F2d 982 [9th Cir 1971], *cert denied* 405 US 963; *United States v Acuff,* 410 F2d 463 [6th Cir 1969], *cert denied* 396 US 830; *Cardarella v United States,* 375 F2d 222 [8th Cir 1967], *cert denied* 389 US 882; *United States v Breland,* 376 F2d 721 [2d Cir 1967]; *Hines v United States,* 365 F2d 649 [10th Cir 1966]).

Whether by statute, rule or judicial discretion, the purpose of sequestration under the modern trend is prophylactic rather than coercive. It is aimed at maintenance of the jury's impartiality by insulating the jurors from outside influences, or the possibility thereof, and thereby insuring that their verdict will be based upon the evidence developed at trial. Thus, the draconian deprivation of the common-law rule finds no place in our current system of justice (see, *Mandatory Jury Sequestration Deemed Archaic by Administrative Judge, op. cit.).* New York has given effect to this purpose by drawing a distinction between separating the jury during the evidentiary stage of trial and during deliberations. CPL 270.45 commits to the sound discretion of the Trial Judge the decision to permit separation of the jurors or their sequestration at any stage of the trial up until submission of the case to the jury.[3]

Certainly, a case can be made for differentiating between

---

**3.** Similar distinctions have been drawn in the courts of other jurisdictions. There is a diversion of authority on the issue of whether the Trial Judge possesses authority to allow separation of the jury after the case has been submitted to it. The determination often rests upon whether the case is civil or criminal; the nature of the charge; whether the parties have

separating the jury during the evidentiary stage of trial and during deliberations. Several of our sister State jurisdictions have found that jurors are especially sensitive to prejudicial influences during deliberations whereas during the phase of trial when the jury is still hearing evidence the impact of prejudicial influences will be dissipated by subsequent evidence, the arguments, and instructions *(see, e.g., Livingston v State,* 458 So 2d 235, 239 [Fla]; *State v Smalls,* 99 Wash 2d 755, 665 P2d 384, 390). Nevertheless, authority also exists for the proposition that this line of demarcation, i.e., making sequestration mandatory during deliberations but discretionary during the course of the trial, is artificial and unsound *(see, United States v Acuff,* 410 F2d 463, 466, *cert denied* 396 US 830; *United States v D'Antonio,* 342 F2d 667, 672 [7th Cir 1965], *overruled by United States v Arciniega,* 574 F2d 931, *cert denied sub nom. Marquez v United States,* 437 US 908, *supra;* Note, *Sequestration: A Possible Solution to the Free Press—Fair Trial Dilemma,* 23 Am U L Rev 923, 941, [1974]; *Mandatory Jury Sequestration Deemed Archaic by Administrative Judge, op. cit.,* at 25). Jurors who are susceptible to outside influences are just as likely to be subject to tampering during the course of the trial as during the deliberative phase. Rather than being determined on the basis of an artificial distinction, the decision to permit separation should be made on an ad hoc basis with the determination turning on the special facts of each case rather than the stage of the trial process *(see, United States v Acuff, supra).*

### B.

In this case, since the mandatory sequestration provision of CPL 310.10 governs, there is no question that the statute was violated by the court permitting the jurors to separate during an overnight recess. Rather, given the defense counsel's agreement to the separation within specified parameters and the defendant's personal consent to this procedure on the basis of the conditions set forth by his counsel, the question is whether defense counsel's and the defendant's actions constituted a waiver of the rights secured by CPL 310.10. The defendant

consented; and whether there is a probability of exposure of the jury to improper influences. Many cases are decided on the basis of statute or rule *(see generally,* Annotation, *Separation of Jury Before Presentation,* 72 ALR2d 100; Annotation, *Separation of Jury During Trial,* 72 ALR3d 131; Annotation, *Separation of Jury after Submission,* 72 ALR3d 248; 23A CJS, Criminal Law, § 1363 *et seq.).*

contends, on the strength of the Court of Appeals decision in *People v Coons* (75 NY2d 796), that he could not consent to a procedure at variance with the statutory mandate. The point of the *Coons* decision was that a trial court's violation of CPL 310.10 by failing to keep the jury together during deliberations was an error which would effect the organization of the court or the mode of the proceedings prescribed by law and such violation presented a question of law for appellate review even absent a timely objection or even if the defendant acceded to the procedure.

The People have urged that the concepts of preservation and waiver are severable and, thereby, intimate that the principle espoused in *Coons (supra)* does not preclude a finding that the defendant waived his rights under CPL 310.10. We agree that the statutory mandate creating a right to a sequestered jury during deliberations was subject to waiver. In reaching this determination we note that prior to *Coons* the Third Department had held that the consent of the defendant and his counsel to the separation of the jury during deliberations, where the defendant suffered no prejudice therefrom, constituted a waiver of his CPL 310.10 rights *(see, People v Silvernail,* 55 AD2d 72, 75, *supra).* Notably, the prosecutor at trial in this case relied upon *Silvernail* in agreeing to the separation of the jury upon the condition that a personal waiver be extracted from the defendant. Following the decision in *Coons,* the Third Department implicitly found that *Silvernail* was no longer viable precedent based upon its interpretation of *Coons* as holding that a violation of CPL 310.10 could not be waived *(see, People v Ciccarelli,* 161 AD2d 952; *accord, People v Marks,* 167 AD2d 974; *People v Gaskin,* 162 AD2d 1056; *People v Dasher,* 161 AD2d 1207; *People v Smith,* 161 AD2d 1160). We do not follow the Third Department's reasoning because we believe it is predicated upon far too expansive a reading of the *Coons* decision.

Both the New York and Federal Constitutions provide for trial by an impartial jury in criminal cases (NY Const, art I, § 2; US Const 6th Amend). Thus, it may be argued that the right to have a jury sequestered during deliberations is nothing less than the right to be tried by an impartial jury. Although sequestration may be necessary in certain cases to prevent prejudice created by excessive publicity surrounding a case or other factors, we do not find that sequestration is such an integral part of the right to a jury trial that it constitutes a fundamental or constitutionally guaranteed right. It is clear

that under Federal law where it is within the trial court's discretion to permit the jury to separate, whether before or during deliberations, there can be no constitutional right to sequestration *(see, Powell v Spalding,* 679 F2d 163, 166, n 3 [9th Cir 1982]; *Young v State of Alabama,* 443 F2d 854, 856 [5th Cir 1971], *cert denied* 405 US 976; 23A CJS, Criminal Law, § 1363). In view of CPL 270.45 relegating the issue of jury separation during the trial before deliberations to the discretion of the Trial Judge, we are persuaded that the right to a sequestered jury during deliberations pursuant to CPL 310.10, being strictly a product of statute, likewise does not inhere in the guarantee of trial by jury contained in NY Constitution, article I, § 2. Thus, the trial court's failure to sequester the jury during its deliberations was not an error of constitutional dimension. Even accepting the defendant's argument predicated on the *Coons* decision *(supra)* that the failure to timely object to the separation cannot alone serve as a waiver of that claim, the nature of the right to sequestration is such that even if it could not be relinquished by the inaction of counsel, the defendant could forego the right by directly and personally waiving it.

The Court of Appeals has repeatedly recognized in its decisions that although often inextricably intertwined, the questions of preservation and waiver are conceptually severable *(see, People v Ahmed,* 66 NY2d 307, 311; *People v Michael,* 48 NY2d 1, 5, n 1; *People v Iannone,* 45 NY2d 589, 600). A particular error may be reviewable in the absence of an objection, and yet the right violated thereby may be waived by the defendant. In *Johnson v Zerbst* (304 US 458, 464), the United States Supreme Court set forth the criteria for testing the validity of a waiver of fundamental constitutional rights. *Johnson v Zerbst (supra),* addressed the issue of waiver of the Sixth Amendment right to the assistance of counsel in a Federal criminal trial. In the course of reaching its determination that the petitioner in the habeas corpus proceeding did not competently waive his right to counsel, the Supreme Court enunciated the generally applicable standard for waiver as follows: "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver * * * must depend, in each case, upon the

particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused" *(Johnson v Zerbst, supra,* at 464, quoting *Ohio Bell Tel. Co. v Public Utils. Commn.,* 301 US 292, 307).

The demand for a knowing and intelligent waiver "has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial" *(Schneckloth v Bustamonte,* 412 US 218, 237). Consistent with this general rule, the Supreme Court in *Schneckloth* held the *Johnson* criteria inapplicable to assess the effectiveness of a consent search even though the defendant therein was not informed of his right to require a warrant. The *Schneckloth* court determined that a knowing and intelligent waiver was not required "in every situation where a person has failed to invoke a constitutional protection" *(Schneckloth v Bustamonte, supra,* at 235).

Although, as previously noted, we do not believe the challenged error to be of constitutional dimension, we need not determine for purposes of this decision whether only a knowing and intelligent action will bind the defendant to the relinquishment of the right to a secluded jury after the commencement of deliberations. Since the particular facts of this case reflect that such an intelligent and knowing waiver was given, our analysis need go no further. The defendant in this case is an experienced criminal defense lawyer who is fully aware of the panoply of rights to which a criminal defendant is entitled whether as a consequence of Federal and State constitutional requirements or pursuant to statute or rule. The colloquy with regard to the question of whether the jury should be allowed to separate during the deliberative process was exceptionally detailed. The defense counsel was given ample opportunity to set forth any objection he may have had to the process suggested. Moreover, he was permitted to set the parameters upon which his consent to separation of the jury during the deliberative phase of the trial would be based. The defendant was present during the colloquy and, upon the court's inquiry, he personally agreed to the procedure by which the jury would be permitted to separate during its deliberations. He specifically noted that his agreement to relinquish his right to sequestration was conditioned upon the factors set forth by his attorney, i.e., that the jury would break for dinner and then return to the courthouse to continue the deliberations. Under these circumstances, where both defense counsel and the defendant affirmatively con-

sented to the jury separation, adequate cautionary instructions were given prior to the separation and there is no other indication of a substantial likelihood of prejudice flowing from the failure to sequester the jury, we find that issue should be considered waived. Upon the facts before us, we cannot conclude that the failure to sequester the jury was a denial of the defendant's rights to due process or to a fair trial by an impartial jury.

In reaching this determination, we have considered that the defendant's determination to forego his right to sequestration may be deemed to fall within the category of tactical decisions. Defense counsel and the defendant may have preferred that the jury be allowed to separate for a variety of reasons. The trial was unusually lengthy and undoubtedly involved considerable inconvenience, if not hardship, to the members of the jury. Inconveniencing the jury further by the possible lengthy confinement entailed in sequestration during deliberations and the concomitant separation from the comforts of home and family may well have resulted in a destruction of the impartiality of the jury due to the emotional and psychological effects that come from such confinement. Indeed, sequestration may undermine the very purpose of the procedure by encouraging a hasty verdict by a jury seeking early discharge and thereby result in an unfair trial. Given the myriad of possible tactical reasons for the defendant choosing to forego his right to jury sequestration, it would not be fair to now permit him to claim reversible error on appeal where his waiver did not produce a favorable result. The trial court's repeated admonitions to the jury during the course of the trial and prior to the jury separation served to dispel any potential prejudice to the defendant flowing from the failure to sequester. Accordingly, the defendant effectively made a knowing and intelligent personal waiver of his right to have the jury sequestered.

## III

We turn now to the issue of whether the defendant's guilt of one count of perjury in the first degree and three counts of criminal contempt in the first degree was established beyond a reasonable doubt and whether the jury's verdict is supported by the weight of the evidence. The defendant's perjury conviction on count two of the indictment arises out of his answers to questions concerning a luncheon meeting at a restaurant

between himself and Robert Tassio, the attorney for the prosecution witness David Rizzo. The defendant was charged with falsely testifying before a Grand Jury investigating allegations of the bribery of Rizzo, in which scheme Judge Ferraro was implicated, that he had not told Tassio that the legal fees Tassio incurred in representing Rizzo would be paid by Judge Ferraro.

The evidence, when viewed in the light most favorable to the People (see, People v Contes, 60 NY2d 620), is legally sufficient to support the conclusion that the defendant lied to the Grand Jury when he stated he had not discussed with Tassio Judge Ferraro's undertaking the payment of Tassio's legal fees. The defendant's false testimony was material to the Grand Jury proceeding since it had the " 'tendency to impede, influence or dissuade the grand jury from pursuing its investigation' " (People v Davis, 53 NY2d 164, 171, quoting United States v Stone, 429 F2d 138, 140; see, Penal Law § 210.15; People v Stanard, 42 NY2d 74, 80, cert denied 434 US 986; People v Smith, 153 AD2d 764, 765). Since one of the objectives of the Grand Jury was the investigation of Judge Ferraro's alleged complicity in bribing a prosecution witness, the defendant's false statement undermined the investigation by shielding Judge Ferraro's participation in the alleged bribery from discovery by the Grand Jury. In any event, materiality is a question of fact for the jury (see, People v Davis, supra, at 170; People v Bartolotta, 124 AD2d 588) and we perceive of no reason upon this record to disturb its determination of this essential element of the first degree perjury charge.

We further find that the falsity of the defendant's testimony was sufficiently corroborated by the tape recording of the subject meeting between the defendant and Tassio; the testimony of the investigator who wired Tassio prior to the meeting, monitored the meeting through one of the transmitters, removed the device immediately upon Tassio's leaving the restaurant where the meeting took place and checked the length and content of the tape against a contemporaneously recorded backup tape; and the defendant's own testimony which corresponded to many details contained in the tape recording (see, Penal Law § 210.50; People v Stanard, supra, at 79; People v Smith, supra; People v Visintin, 122 AD2d 179, 180).

Equally unpersuasive is the defendant's contention that he was the victim of a perjury trap. Generally, whether a prosecutor has set a trap primarily to support a prosecution of

perjury against a witness is a question of fact for the jury *(see, People v Davis,* 53 NY2d 164, 174, *supra; People v Tyler,* 46 NY2d 251, 259). At bar, the jury properly rejected the perjury trap defense as the purpose of the Grand Jury investigation was the allegations of bribery with respect to Rizzo's recanting affidavit and Ferraro's payment of Rizzo's legal fees as an inducement thereof. Thus, the interrogation of the defendant during the Grand Jury proceedings went to the very heart of those proceedings and did not have perjury as its sole objective *(People v Davis, supra,* at 172; *cf., People v Tyler, supra,* at 262). It is clear that the subject matter of the particular line of questioning involving a Supreme Court Justice in the tampering of a prosecution witness, the intentional falsifying of evidence and the destruction of other evidence to conceal the bribery scheme should have made it memorable and the prosecutor provided ample cues, through repetition and re-statement particularly of inquiries related to statements made on the tape recorded luncheon meeting with Tassio, to stimulate the defendant's recollection *(see, People v Schenkman,* 46 NY2d 232, 234; *People v Pomerantz,* 46 NY2d 240, 243).

Contrary to the defendant's contention, the perjury trap defense is not demonstrated by the prosecutor's failure to play the tape of his luncheon meeting with Tassio or to produce a cover letter sent to Tassio with the recanting affidavit which the defendant subsequently asked Tassio to destroy as the defendant was given ample opportunity to modify or retract the false statements he made. The law does not require a prosecutor, when faced with a falsehood, to confront the defendant with contrary evidence such as the tape recording at issue at bar, and thereby provide the defendant an opportunity to tailor his testimony to conform to the available information and preclude the prosecutor from adding to his knowledge of the events under investigation *(see, People v Davis, supra,* at 174; *People v Pomerantz, supra,* at 249; *cf., People v Tyler, supra,* at 261). The defendant continually professed a lack of recall of the luncheon meeting with Tassio and denied knowledge of the cover letter. Hence, there was no recollection capable of being refreshed.

■ We further find that the evidence was legally sufficient to support the defendant's conviction of criminal contempt under the third, fourth and fifth counts of the indictment (Penal Law § 215.51). To sustain the conviction for criminal contempt the jury must have found beyond a reasonable doubt that the defendant's responses to questions posed to him during the Grand Jury proceedings were intended as no

answer at all and were thus tantamount to a refusal to answer *(see, People v Fischer,* 53 NY2d 178, 184; *People v Schenkman,* 46 NY2d 232 237, *supra; People v Ianniello,* 36 NY2d 137, 142, *cert denied* 423 US 831). As previously noted, the events which were the subject of the inquiry, i.e., the recanting affidavit, the bribery of Rizzo, Judge Ferraro's involvement in the bribery, and the attempts to conceal any involvement in the scheme, were sufficiently memorable that the defendant's repeated responses to questions concerning these events, i.e., "I don't know", "I don't think so" and "I don't recall", were made with the intention of evading an answer to the questions posed *(see, People v Gottfried,* 61 NY2d 617, 619). Of significance to this inquiry is the fact that the defendant's professional reputation and his very livelihood, as well as those of a Supreme Court Justice with whom he admittedly had a deep affection akin to the relationship of a father, were in jeopardy as a result of the circumstances surrounding the original insurance fraud case. Everything the defendant had striven to achieve during his professional career he was at risk of losing. These situations were not merely incidental to one criminal case among the many which the defendant handled in his practice. Under these circumstances, the jury was warranted in concluding that the defendant's professed inability to recall and like responses were an intentional evasion *(see, People v Ignatow,* 126 AD2d 566; *People v Murdocca,* 120 AD2d 682).

As with his arguments addressing the sufficiency of the perjury conviction, the defendant asserts that he was the victim of a contempt trap. Since this defense is essentially grounded upon the same concepts as the perjury trap, it presented a question of fact for the jury *(see, People v Fischer, supra,* at 183, n 1). Our analysis similarly reveals that the record is devoid of evidence to substantiate the claim of the prosecutor's preoccupation with trapping the defendant *(see, People v Fischer, supra; People v Smith,* 153 AD2d 764, 766, *supra).*

Lastly, upon the exercise of our factual review power, we are satisfied that the verdict of guilt as to both the perjury and criminal contempt counts was not against the weight of the evidence (CPL 470.15 [5]; *People v Bleakley,* 69 NY2d 490, 493).

## IV

The defendant's remaining contentions, including (1) his

claim that the indictment should be dismissed for a failure to establish it was voted upon by 12 of 18 grand jurors who heard all the critical and essential evidence presented, (2) his claim that it was improper to assign an out-of-district Judge to hear his case, and (3) his claim that numerous instances of prosecutorial misconduct in the course of the trial of this matter deprived him of his right to a fair trial, to the extent that such claims of error have been preserved for appellate review, have been considered and found to be lacking in merit.

■ Finally, we do not find the defendant's sentence of four concurrent terms of 60 days' imprisonment and five years' probation, with the terms of imprisonment running concurrently with and as conditions of the terms of probation, to be unduly harsh or excessive under the circumstances of this case. The defendant is an experienced criminal defense attorney and former Assistant District Attorney who was fully familiar with Grand Jury proceedings and the need to preserve the integrity of the Grand Jury. His conduct during the course of the Grand Jury investigation and proceeding exhibited an intentional effort to impede the functioning of the Grand Jury. Although, as the defendant urges, no fraud was perpetrated upon an individual client, the defendant's actions undermined the integrity of the entire legal profession and the judicial system. As an officer of the court, the defendant abused the very system he was under a duty to serve. Given these facts, we do not find that the sentence imposed constituted an improvident exercise of discretion *(see, People v Smith,* 153 AD2d 764, 766, *supra; People v Landsman,* 140 AD2d 629; *People v Suitte,* 90 AD2d 80). Accordingly, the judgment is affirmed.

BRACKEN, LAWRENCE and EIBER, JJ., concur.

Ordered that the judgment is affirmed, and the matter is remitted to the County Court, Westchester County, for further proceedings pursuant to CPL 460.50 (5).